2007 OK CR 28

**Jimmy Dean HARRIS, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2005–117.**

Court of Criminal Appeals of Oklahoma.

July 19, 2007.

James T. Rowan, Oklahoma City, OK, attorney for defendant at trial.

Michael D. Morehead, Kathleen Smith, Appellate Defense Counsel, Capital Direct Appeals Division, Oklahoma Indigent Defense System, Norman, OK, attorneys for appellant on appeal.

C. Wesley Lane II, District Attorney, Patricia L. High, Assistant District Attorney, Oklahoma City, OK, attorneys for the state at trial.

W.A. Drew Edmondson, Attorney General of Oklahoma, Preston Saul Draper, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## *OPINION*

CHAPEL, Judge.

¶ 1 Jimmy Dean Harris was tried by jury and convicted of Murder in the First Degree in violation of 21 O.S.1991, § 701.7, in the District Court of Oklahoma County, Case No. CF–1999–5071. On appeal, this Court reversed the punishment of death recommended by the jury and imposed by the trial court, and remanded the case for resentencing.[1] The jury at Harris's resentencing trial

---

1. *Harris v. State*, 2004 OK CR 1, 84 P.3d 731. Harris was also convicted of Shooting with Intent to Kill and Assault and Battery with a Dangerous Weapon, and sentenced to life and ten years imprisonment. These convictions and sentences were upheld on appeal.

found that Harris knowingly created a great risk of death to more than one person, and constituted a continuing threat to society. In accordance with the jury's recommendation, the Honorable Virgil C. Black imposed the death penalty. Harris appeals from this sentence.

¶2 Harris, who was a skilled transmission mechanic, and his wife, Pam, worked in front office positions in transmission shops. Throughout their relationship the two often worked together. Despite being business partners as well as husband and wife, they had a stormy relationship. This worsened significantly when Pam was hired, but Harris was not, to work in Merle Taylor's AAMCO transmission shop in Oklahoma City. Harris commuted to work in Texas for several months, during which time the marriage suffered. After Harris had a work-related accident, he returned to Oklahoma. By the summer of 1999, Pam told him the marriage was over. While Harris agreed to a divorce, he was angry and upset, and continued to hope Pam would return to him. In mid-August of 1999, Harris called Pam, threatening to kill her, her parents, their daughter, her co-workers, and Merle Taylor. Pam got a protective order against Harris and filed for divorce. The divorce was granted on August 25, 1999, and Harris was ordered to leave the home without removing any property. Harris and Pam had previously taped an agreement dividing the house property. On the evening of the 25th, Harris moved out of the home, taking furniture and many of Pam's personal possessions. He also vandalized the house. Pam discovered the damage the next day, found out where Harris had stored her furniture and his tools, and had a lock put on that shed. In the succeeding days Harris called Pam often demanding that she remove the lock. Each time, she explained she could neither talk to him nor remove the lock, and told him to call her attorney. He refused, explicitly stating he would talk to her. He continued to threaten her and others. On August 31, 1999, he threatened to kill Pam and was seen driving by the AAMCO shop.

¶3 On the morning of September 1, 1999, Harris called the AAMCO shop several times, demanding that she remove the lock on the storage shed and threatening Pam and Merle Taylor. At approximately 9:00 a.m. Harris arrived at the shop and asked for Pam, who was standing with Merle Taylor and his daughter-in-law Jessica. He shot Taylor twice at close range, and shot at Jessica. Harris shot Pam, chased her when she ran, and pistol-whipped her when he ran out of bullets and could not quickly reload his gun. When Pam escaped, Harris fled, discarded the gun and his van, and hid in a friend's garage. Harris claimed he was angry and upset, and could not make good decisions because he was of low intelligence, was under the influence of alcohol and drugs, and was mentally ill (although not legally insane).

¶4 To support the aggravating circumstances, the State presented the evidence of the circumstances of the crimes. There was also evidence that, during the ongoing difficulties in mid-August, Pam had called police and Harris had resisted arrest. The State presented evidence that Harris assaulted a jailer while awaiting trial, and had physically, verbally and emotionally abused Pam throughout their relationship. The State also presented victim impact evidence. In mitigation, Harris presented evidence from his family and former co-workers, as well as expert evidence, regarding his traumatic and abusive childhood, history of substance abuse, low intelligence, emotional instability, and possible mental illness.

### Issues Regarding Jury Selection

¶5 In Proposition V Harris claims that the trial court's failure to provide the jury with cautionary instructions on the taking and use of notes during trial and deliberation deprived him of his rights to a fair trial and due process. The trial court allowed jurors to take notes during the course of the trial and provided them with notebooks and pencils. The court told jurors that any notes they took were for their personal use, and would not become part of the public record. However, the trial court did not instruct jurors on the taking and use of notes during trial or deliberations. Harris claims this omission deprived him of a right to a fair trial and due process. He neither requested

these instructions at trial, nor objected to the trial court's failure to give them, and has waived all but plain error. There is none.

[3, 4] ¶ 6 In *Cohee v. State* we held that a trial court may, in its discretion, allow jurors to take notes.[2] While *Cohee* explained why note-taking may be beneficial, and set forth guidelines for the trial court's consideration, it did not promulgate or require any specific instructions on the process of note-taking.[3] The Uniform Jury Instructions include instructions on note-taking which are based on the comments and guidelines in *Cohee*.[4] The Notes on Use to the Uniform Jury Instructions (revised) note that, in keeping with *Cohee*, these instructions are recommended, not mandatory. Trial courts should use both mandatory and recommended uniform instructions which accurately state the applicable law.[5] However, the failure to use recommended instructions does not require reversal where the jury is accurately instructed on the law. In *Hanson v. State*,[6] this Court previously considered the failure to use the recommended instructions on jury note-taking. We determined that this omission was not plain error, where the instructions to the jury, "taken as a whole, fairly and accurately stated the applicable law, channeling juror's discretion in their use of notes."[7] The trial court told jurors that notes were for their personal use only. Jurors were otherwise properly instructed on their function, the definition of evidence, and the trial and deliberations process. Taken together, these instructions properly narrowed the jury's discretion to use notes taken during trial. The trial court's omission was not plain error.

## Issues Relating to the Sentencing Stage of Trial

▮▮▮ ¶ 7 Harris argues in Proposition III that the trial court's failure to provide a complete record of the proceedings leading to his death sentence violated his constitutional rights. In a capital case, the State has the burden to ensure a complete record of the trial is provided, which will enable the Court to conduct its mandatory sentence review.[8] However, failure to provide a complete record is not *per se* reversible error.[9] In *Pickens v. State*, private conversations with two jurors during voir dire were not recorded. The Court found that, as no errors were alleged during jury selection and the potential jurors were excused for cause, no error was shown and our ability to conduct the mandatory sentence review was not affected.[10] By contrast, in *Van White* the parties completely failed to transcribe *voir dire* proceedings. This deprived the Court of the ability to consider potential juror bias or other questions of improper juror prejudice as part of our mandatory sentence review, and required reversal.[11] The defendant must show that the failure to transcribe a portion of the trial resulted in error and affects this Court's ability to conduct a mandatory sentence review.[12] Harris fails to

---

**2.** *Cohee v. State,* 1997 OK CR 30, 942 P.2d 211, 213.

**3.** *Cohee,* 942 P.2d at 214–15.

**4.** OUJI–CR (2d) 1–9, 10–8A.

**5.** 12 O.S.2001, § 577.2.

**6.** 2003 OK CR 12, 72 P.3d 40, 46.

**7.** *Hanson,* 72 P.3d at 46.

**8.** *Van White v. State,* 1988 OK CR 47, 752 P.2d 814, 820–21.

**9.** *Pickens v. State,* 2001 OK CR 3, 19 P.3d 866, 881. In *Pickens,* private conversations with two jurors during voir dire were not recorded. The Court found that, as no errors were alleged during jury selection and the potential jurors were excused for cause, no error was shown and our ability to conduct the mandatory sentence review was not affected.

**10.** *Pickens,* 19 P.3d at 881. *See also Mooney v. State,* 1999 OK CR 34, 990 P.2d 875, 884 (failure to transcribe competency hearing was cured when an evidentiary hearing determined application for competency had been denied); *Cannon v. State,* 1998 OK CR 28, 961 P.2d 838, 848 (failure to transcribe reading of instructions to the jury not error where written instructions are included in record on appeal); *Parker v. State,* 1994 OK CR 56, 887 P.2d 290, 294 (failure to transcribe bench conferences did not require reversal);

**11.** *Van White,* 752 P.2d at 821.

**12.** *Pickens,* 19 P.3d at 881.

meet this standard. As our discussion shows, this record is complete enough for this Court to determine whether the jury's verdict was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether sufficient evidence supports the aggravating circumstances.[13]

¶ 8 During deliberations, Harris's jury asked for a dictionary. The trial court responded in writing by asking what word the jury wanted defined. Jurors replied that they wanted definitions for "probability" and "possibility". The trial court sent typewritten dictionary definitions of those words to the jury room. While this exchange of notes is physically preserved, the trial record makes no mention of them. There is no indication whether the trial court discussed these requests with the parties, or if so, whether defense counsel agreed to the trial court's resolution of the question.[14]

¶ 9 Harris first claims that this Court cannot determine whether the trial court appropriately answered the jury by supplying the requested dictionary definitions without knowing the context for the jury's request. Harris suggests that a dictionary definition would be inappropriate for "some words" which are legal terms of art, but fails to show that either "probability" or "possibility" falls within that category. The word "possibility" is found in every instruction which mentions the punishment alternatives "imprisonment for life without the possibility of parole, or imprisonment for life with the possibility of parole." [15] "Probability" occurs in the context of the continuing threat aggravating circumstance, "a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." [16] These are the only contexts in which these words are mentioned in the jury in-

structions. Harris would have this Court speculate on other contexts within which the jury might have wanted definitions of the words, but does not show any context in which a dictionary definition would be improper. Harris recognizes that we have recently warned trial courts against allowing jurors any outside reference material in deliberations, including dictionaries.[17] The trial court here acted appropriately in refusing the jury's request to have a dictionary in the room during deliberations. However, the trial court attempted to be responsive to the jury's request, as we encourage trial courts to do,[18] and provided the exact information jurors requested. Neither the record before us, nor Harris's argument, suggests that this decision was an abuse of discretion. As counsel could not have been ineffective had counsel failed to object to this decision, the incomplete record on this issue does not impede our ability to conduct a review.

¶ 10 Harris also claims that the trial court violated statutory procedures in handling the jury's questions. If jurors express disagreement regarding testimony or have a question on a point of law, they should be brought into court and the trial court should answer their question only in the presence of all parties, or after they have been called.[19] Harris suggests this Court must presume prejudice from the trial court's failure to follow this procedure, because the circumstances surrounding the trial court's receipt of and answer to the questions were not transcribed. However, the record, in the form of the written notes, shows that the trial court did not abuse its discretion in answering jurors by giving them what they requested, without allowing a dictionary into the jury room. On this record, the trial

---

13. 21 O.S.2001, § 701.13.

14. The State argues that there is no record Harris objected to these instructions, so the issue is waived. The lack of record is Harris's point. As the Court cannot determine from this record whether Harris had an opportunity to object, we will not consider the claim waived.

15. Instructions 1, 3, 6, 10, 16; O.R. IX, 1598, 1601, 1604, 1611, 1619.

16. Instructions 2, 4, 5, 7; O.R. IX, 1599, 1602, 1603, 1605.

17. *Glossip v. State,* 2001 OK CR 21, 29 P.3d 597, 605.

18. *Cohee,* 942 P.2d at 215 (trial court should attempt to answer juror questions as fully as the law permits).

19. 22 O.S.2001, § 894.

court's failure to follow the statutory procedure is harmless.[20]

¶ 11 Here, as the State notes, the appellate record contains the written notes exchanged between trial court and jury. The record does not show whether defense counsel had an opportunity to object to the trial court's instruction defining the words "probability" and "possibility". However, this Court is able to review the exchange itself.[21] We have done so, and concluded that (a) the trial court did not abuse its discretion in providing dictionary definitions to jurors, and (b) the trial court's failure to bring the jury into open court upon receiving the request did not prejudice Harris. The record is sufficient to allow this Court to conduct its mandatory sentence review.

¶ 12 Merle Taylor's son and wife each gave victim impact evidence, and asked jurors to impose the death penalty. Harris argues in Proposition VII that this recommendation was unconstitutional and denied him his right to a fair trial. Harris admits that this Court has held that family members of the victim may recommend a sentence in a capital sentencing trial,[22] but urges us to reconsider. We decline this invitation.

¶ 13 In Proposition VIII Harris argues that the State improperly re-alleged the continuing threat aggravating circumstance. In Harris's original trial and again at resentencing, the State alleged that Harris would constitute a continuing threat to society. At Harris's first trial, jurors did not find this aggravating circumstance. Harris claims that this failure is equivalent to an acquittal,

and that the State was barred from re-alleging that he would be a continuing threat in the resentencing proceedings. This Court recently considered and rejected this claim in *Hogan v. State*.[23] We will not reconsider it in this case.

¶ 14 Harris claims in Proposition IX that insufficient evidence supported the jury's finding of the continuing threat aggravating circumstance. The jury found that there existed a probability that Harris would commit criminal acts of violence which would constitute a continuing threat to society. Harris claims the State presented insufficient evidence that he presented a continuing threat to society. To support this aggravating circumstance, the State must show that Harris's past behavior, through convictions or unadjudicated crimes, showed a pattern of criminal conduct which will probably continue to exist in the future.[24] On appeal, we will uphold the jury's finding if, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could find the charged aggravating circumstance beyond a reasonable doubt.[25]

¶ 15 Harris admits that the State offered four separate types of evidence to prove this aggravating circumstance. All were admissible to show a pattern of violence which was likely to continue. This Court has upheld use of both the circumstances of the crime and unadjudicated offenses to support this aggravating circumstance.[26] Common evidence used to prove that a defendant is a continuing threat to society includes "the de-

---

**20.** *Welch v. State*, 1998 OK CR 54, 968 P.2d 1231, 1245.

**21.** *Cannon*, 961 P.2d at 848 (ability to review not impeded where Court can determine from the record what instructions were given to jury).

**22.** See, e.g., *DeRosa v. State*, 2004 OK CR 19, 89 P.3d 1124, 1151–52; *Conover v. State*, 1997 OK CR 6, 933 P.2d 904, 920; *Ledbetter v. State*, 1997 OK CR 5, 933 P.2d 880, 890–91. Harris does not claim that the victim impact evidence itself was improper, other than the recommendation of punishment.

**23.** *Hogan v. State*, 2006 OK CR 19, 139 P.3d 907, 929–30, *cert. denied*, —— U.S. ——, 127 S.Ct. 994, 166 L.Ed.2d 751 (2007). I dissented on this issue in *Hogan*, and yield my vote on the basis of *stare decisis*.

**24.** *Malicoat v. State*, 2000 OK CR 1, 992 P.2d 383, 397.

**25.** *Warner v. State*, 2006 OK CR 40, 144 P.3d 838, 878; *DeRosa*, 89 P.3d at 1153; *Malicoat*, 992 P.2d at 397.

**26.** See, e.g., *Hooper v. State*, 2006 OK CR 35, 142 P.3d 463, and cases cited therein. I continue to believe that evidence of unadjudicated offenses should not be admitted to support the continuing threat aggravating circumstance. I find that, even without this evidence, sufficient evidence supports the finding of this aggravating circumstance beyond a reasonable doubt.

fendant's history of violent conduct, the facts of the homicide at issue, threats made by the defendant, lack of remorse, attempts to prevent calls for help, mistreatment of family members and testimony of experts."[27] While Harris claims that, at best, the State's evidence shows he was a danger to Pam, in fact the evidence taken as a whole shows Harris has a lifelong pattern of using violence to solve problems and react to situations which is likely to continue.

¶ 16 Through Pam, family members, and co-workers, the State offered evidence of ongoing domestic violence, including Harris's physical, verbal and mental abuse of Pam, which lasted throughout the course of their relationship. Among other things, Harris dislocated Pam's jaw, kicked her in the face, slammed her legs in a car door, and pushed and shoved her. Due to arguments, his drinking, and the threat of violence, Pam left Harris between eighty and 100 times during the course of their marriage, only to return after each episode ended. Some witnesses also testified that Pam instigated arguments with Harris, got the better of him in verbal arguments, and even pushed him. Harris characterizes all this as evidence of a dysfunctional marriage. However, where the evidence conflicts, this Court will not substitute its judgment regarding the weight and credibility of the evidence for that of the jury's.[28]

¶ 17 The State also presented evidence of other violent episodes in Harris's life. His own expert and a brother testified that he had been in fights as a child and bar fights throughout his life. Harris claims without citation that this evidence was inadmissible to support the continuing threat aggravating circumstance as no details were given regarding the fights. He did not object to this testimony at trial and we review for plain error only. There is none. Harris himself told Dr. Draper that he had fought in school, had been expelled for fighting, and got in bar fights. Dr. Draper relied on this information in forming her opinion, and was required to testify regarding it if asked on cross-examination.[29] His brother testified about the beginnings of bar fights he had witnessed, and about a particular bar fight in which Pam was involved or present.[30] Harris argues that these episodes have no bearing on his potential for future dangerousness. On the contrary, Dr. Draper testified regarding Harris's emotional instability and difficulty handling stress, solving problems, and making good choices when angry. Harris's propensity for physical fights bears directly on his probable future reactions in these circumstances.

¶ 18 The State offered several episodes from August, 1999, as the difficulties between Pam and Harris escalated. On August 15, Pam called the police from her parents' house. She reported Harris was at the family home, had threatened her, her family, and her co-workers, and she believed he was armed. When police came, Harris met them in the yard. The officers asked him to lift up his loose shirt and turn around, explaining they needed to check for a weapon. He initially appeared to comply, hesitated, then ran into the house and locked the door. The police kicked in the door and ordered Harris to the floor. When he refused to comply, they subdued and handcuffed him, and arrested him for resisting an officer. Subsequently, Harris telephoned Pam several times threatening to kill her. When he left the house on August 25, he violated the trial court's order by moving furniture and Pam's personal belongings and vandalizing the house. The act of resisting arrest and death threats are relevant to Harris's future dangerousness. While vandalism, a nonviolent crime, is not in itself indicative of future danger, under the circumstances of this case

---

**27.** *Malicoat,* 992 P.2d at 397.

**28.** *Malicoat,* 992 P.2d at 397. While the Court must independently assess the record evidence and determine that such evidence supports the jury's finding of an aggravating circumstance, *Battenfield v. State,* 1991 OK CR 82, 816 P.2d 555, 565, this merely reflects the appropriate standard of review. We will not substitute our judgment for that of the jury's where sufficient evidence is present.

**29.** 12 O.S.2001, § 2705.

**30.** Mark Harris testified that he had not necessarily seen Harris commit acts of violence because "I usually leave if it gets that bad."

it reflects the pattern of escalating violence which resulted in the crimes.

¶19 Harris had no prior convictions, and only one disciplinary write-up from his years of incarceration in this case. On April 11 2001, while awaiting his preliminary hearing in the Oklahoma County jail, Harris was put on suicide watch. Officer Hill was required to make visual contact with Harris through a cell window every fifteen minutes. Harris blocked the window with paper, and refused to answer when Hill knocked on the door and called his name. As soon as Hill opened the door and stepped inside the cell, Harris attacked him. Harris did not try to escape the cell, but instead punched and kicked Hill and temporarily disabled his radio. He was eventually subdued by several jailers. Harris asserts this action has no bearing on the probability that he constitutes a continuing threat to society. On the contrary, Harris's willingness to attack a jailer, while possibly affected by his mental state, bears directly on his propensity for future violence.

¶20 In addition to the evidence above, the State offered the circumstances of the crimes themselves.[31] After explicitly threatening to kill Pam and Merle Taylor, Harris drove to the AAMCO shop. He was armed and carried extra ammunition. When Harris said he needed to talk to Pam, Taylor reminded him he was not supposed to be at the shop. Harris knocked Taylor down and shot him twice. He pointed the gun and shot at other workers in the area. As they fled, Harris shot Pam, hitting her once. As he continued to shoot she ran. When she tripped, he attempted to shoot her in the head, grazing her scalp. He tried unsuccessfully to reload the weapon, then pistol-whipped her. Pam fought back, pinning Harris's arms in his shirt, and escaped. Harris then fled the scene.

¶21 Evidence that Harris constitutes a continuing threat to society included ongoing domestic violence, fighting since childhood, resisting arrest, death threats, an attack on a jailer, and the circumstances of the crime. Taking the evidence in the light most favorable to the State, any rational trier of fact could find, beyond a reasonable doubt, a pattern of criminal conduct which will probably continue to exist in the future. Sufficient evidence was presented to show there exists a probability that Harris will constitute a continuing threat to society.

¶22 In Proposition X Harris claims that the aggravating circumstance that he would constitute a continuing threat to society is unconstitutional on its face and as applied in Oklahoma. He argues that (a) Oklahoma's statutory definition does not meet standards set forth by the United States Supreme Court; and (b) that, as applied in Oklahoma courts, the aggravating circumstance is not easily understood and fails to channel the jury's discretion. Harris admits that this Court has previously considered and rejected this claim.[32] We do not reconsider it here.

### Issues Relating to Jury Instructions

¶23 In Proposition IV Harris argues the trial court erred in failing to instruct the jury that, if convicted of murder and sentenced to life with the possibility of parole, he would have to serve 85% of his sentence. Harris faced three potential sentences: death, life without the possibility of parole, or life imprisonment. By statute, any person committing an enumerated offense on or after March 1, 2000, must serve 85% of the latter sentence before being eligible to be considered for parole (the 85% Rule).[33] This Court held in *Anderson v. State* that jurors should be instructed on the 85% Rule in

---

31. I have disagreed with the use of the circumstances of the crime to support this aggravating circumstance, but yield to the majority. *Hooper v. State*, 1997 OK CR 64, 947 P.2d 1090, 1108 n. 58; *Cannon v. State*, 1995 OK CR 45, 904 P.2d 89, 106 n. 60. In addition to the circumstances of the crime and unadjudicated offenses, I find there is sufficient other evidence of continuing threat to support the jury's finding of this aggravating circumstance.

32. *See, e.g., Warner*, 144 P.3d at 879; *Myers v. State*, 2006 OK CR 12, 133 P.3d 312, 333–34; *Wackerly v. State*, 2000 OK CR 15, 12 P.3d 1, 16; *Malicoat*, 992 P.2d at 400.

33. 21 O.S.2001, §§ 12.1, 13.1.

every case to which it applies.[34] The record does not indicate that Harris asked for an instruction on the 85% Rule, but he claims that he is entitled to relief because his jury was not so instructed. He is mistaken. Harris's crimes were committed on September 1, 1999. On its face, the 85% Rule does not apply here. This proposition is denied.

■■■ ¶ 24 In Proposition VI Harris argues that the uniform jury instruction on mitigating circumstances, OUJI–CR (2d) 4–78, which was given to his jury, unconstitutionally limited the jury's ability to consider his mitigating evidence. A capital defendant "must be allowed to introduce any relevant mitigating evidence regarding his character or record and any of the circumstances of the offense."[35] "It is settled that a defendant may present in mitigation any aspect of his record or character, and any circumstances of the crime that could possibly convince a jury that he is entitled to a sentence less than death. Likewise, a defendant is also entitled to present any evidence that may assist in rebutting an aggravating circumstance."[36] When considering whether to recommend the death penalty, jurors must look at both the circumstances of the crime and the personal characteristics and propensities of the defendant.[37] The reference to a defendant's characteristics will necessarily include evidence which may be mitigating in nature, but will not extenuate or reduce his moral culpability for the crime. Given this settled law, we must agree with the Tenth Circuit's conclusion that any attempt to limit a jury's consideration of mitigating evidence only to that evidence which may make a defendant less guilty, or the crime less horrible, is unconstitutional.[38] This is true whether the attempted limitation occurs through instruction or argument.

■■■ ¶ 25 Harris argues that the plain language of the uniform instruction's first sentence itself limits the jury's consideration of mitigating evidence. That sentence reads: "Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame."[39] Harris admits this Court has rejected this line of argument.[40] However, he suggests that the language is ambiguous at best, and, combined with prosecutorial argument, foreclosed the jury's consideration of mitigating evidence. He failed to object to either the instruction or argument at trial. Reviewing for plain error, we find none. We do not find that the current uniform jury instruction prohibits jurors from considering mitigating evidence. One prosecutor did consistently argue in closing that jurors should not consider Harris's second stage evidence as mitigating, since it did not extenuate or reduce his guilt or moral culpability. This argument improperly told jurors not to consider Harris's mitigating evidence. However, in final closing a second prosecutor invited jurors to consider all Harris's mitigating evidence, weigh it against the aggravating circumstances, and find that the death penalty was appropriate. The jury was properly instructed on the definition of mitigating evidence, the evidence Harris presented, and its duties. For that reason, the initial prosecutorial argument was harm-

**34.** *Anderson v. State,* 2006 OK CR 6, 130 P.3d 273, 282.

**35.** *California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987) (citations omitted); *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978).

**36.** *Fitzgerald v. State,* 2002 OK CR 31, 61 P.3d 901, 903 (citation omitted). *See also Coddington v. State,* 2006 OK CR 34, 142 P.3d 437, 460; *Fitzgerald v. State,* 1998 OK CR 68, 972 P.2d 1157, 1168; *Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S.Ct. 1669, 1670–71, 90 L.Ed.2d 1 (1986).

**37.** *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); *Gregg v. Georgia,* 428 U.S. 153, 197, 96 S.Ct. 2909, 2936, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

**38.** *Le v. Mullin,* 311 F.3d 1002, 1017 (10th Cir. 2002).

**39.** OUJI–CR (2d) 4–78, O.R. 1607.

**40.** *Primeaux v. State,* 2004 OK CR 16, 88 P.3d 893, 909–10; *Williams v. State,* 2001 OK CR 9, 22 P.3d 702, 727

less.[41]

¶ 26 This Court is troubled, however, by the consistent misuse of the language in this instruction in the State's closing arguments. This Court noted in *Frederick v. State* that the prosecutor could argue mitigating evidence did not reduce a defendant's moral culpability or blame.[42] However, we did not intend to suggest that prosecutors could further argue that evidence of a defendant's history, characteristics or propensities should not be considered as mitigating simply because it does not go to his moral culpability or extenuate his guilt. This would be an egregious misstatement of the law on mitigating evidence. After careful consideration, this Court has determined that an amendment to the language of the instruction will clarify this point, and discourage improper argument. We emphasize that the language of the current instruction itself is not legally inaccurate, inadequate, or unconstitutional. Cases in which the current OUJI–CR (2d) 4–78 has been used and applied are not subject to reversal on this basis.

¶ 27 In conjunction with this case, the Court will refer this issue to the Oklahoma Uniform Jury Instruction Committee (Criminal) for promulgation of a modified jury instruction defining mitigating circumstances in capital cases. To delineate the various purposes of mitigating evidence, this Court suggests including both (a) that mitigating circumstances may extenuate or reduce the degree of moral conduct or blame, and separately, (b) that mitigating circumstances are those which in fairness, sympathy or mercy would lead jurors individually or collectively to decide against imposing the death penalty.[43]

¶ 28 The uniform jury instruction given in this case did not unconstitutionally limit the jury's ability to consider mitigating evidence. The prosecutor's improper argument on this issue was cured by further argument and instruction. Harris's claim for relief is denied. However, this Court finds that the current uniform jury instruction defining mitigating circumstances, OUJI–CR (2d) 4–78, should be modified to clarify the constitutional scope of mitigating evidence and discourage improper argument.

### Ineffective Assistance of Counsel

¶ 29 Harris claims in Proposition I that trial counsel was ineffective for failing, before trial began, to seek a determination that he was mentally retarded and thus ineligible for the death penalty. To prevail on this claim, Harris must show that counsel's performance was so deficient that he did not have counsel as guaranteed by the Sixth Amendment, and that the deficient performance created errors so serious as to deprive him of a fair trial with reliable results.[44] We measure trial counsel's performance against an objective standard of reasonableness under prevailing professional norms.[45] There must be a reasonable probability that, without counsel's errors, the jury would have concluded that a death sentence was not supported by the balance of aggravating and mitigating circumstances.[46] "A reasonable probability is one sufficient to undermine confidence in the outcome."[47] We give great deference to trial counsel's strategic decisions, considering the choices made from

**41.** 21 O.S.2001, § 3001.1; *Le,* 311 F.3d at 1018.

**42.** 2001 OK CR 34, 37 P.3d 908, 949.

**43.** As Harris notes, OUJI–CR (2d) 4–79, describing possible mitigating circumstances, was patterned after a similar New Mexico jury instruction. The language in the New Mexican instruction corresponding to OUJI–CR (2d) 4–78 reads: "A mitigating circumstance is any conduct, circumstance or thing which would lead you individually or as a jury to decide not to impose the death penalty."

**44.** *Browning v. State,* 2006 OK CR 8, 134 P.3d 816, 830, *cert. denied,* — U.S. ——, 127 S.Ct. 406, 166 L.Ed.2d 288 (2006); *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Strickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 2069–70, 80 L.Ed.2d 674, 693 (1984).

**45.** *Rompilla v. Beard,* 545 U.S. 374, 380, 125 S.Ct. 2456, 2462, 162 L.Ed.2d 360 (2005); *Wiggins,* 539 U.S. at 521, 123 S.Ct. at 2527.

**46.** *Browning,* 134 P.3d at 831.

**47.** *Williams v. Taylor,* 529 U.S. 362, 394, 120 S.Ct. 1495, 1513–1514, 146 L.Ed.2d 389 (2000).

counsel's perspective at the time.[48] We will presume counsel's conduct was professional and could be considered sound strategy.[49] This Court will not find counsel ineffective if we find that Harris was not prejudiced by counsel's actions or omissions.[50]

■ ¶ 30 A capital defendant who wishes to claim mental retardation must raise that claim with the trial court before the trial begins.[51] A threshold requirement for such a claim is one IQ test of 70 or below; such a test will not itself guarantee a finding of mental retardation but may begin the process by which the court determines whether a defendant is mentally retarded.[52] Harris had two IQ test scores, obtained during the pretrial process, of 66 and 68.[53] He complains that counsel did not use these scores to initiate this process and attempt to determine whether he was mentally retarded before trial began. Harris argues that, given his test scores, if counsel had asked for a hearing to determine mental retardation the trial court would have been required to hold that hearing. At that hearing Harris might or might not have been found mentally retarded, but if he were found to be retarded, he would avoid the death penalty. Thus, Harris claims, he had nothing to lose and everything to gain by raising the issue, and counsel was ineffective for failing to do so.

¶ 31 Harris cannot show he was prejudiced by counsel's failure. To prevail on a pretrial claim of mental retardation, Harris would have to show (1) significantly subaverage intellectual functioning; (2) manifested before the age of 18; (3) accompanied by significant limitations in adaptive functioning in at least two of nine enumerated skill areas.[54] All the evidence in the record, including the evidence from the first trial and competency hearing, indicates that Harris could not meet this test. Despite these two IQ scores, all Harris's other IQ scores were over 70. All Harris's experts, including the ones who testified at his first trial and competency hearing, considered these scores along with Harris's other characteristics and concluded he was not mentally retarded.[55] Harris's expert, Dr. Draper, testified at his trial that he was not mentally retarded. She and other experts stated in this and other proceedings that Harris was "slow" or of low intelligence, but all agreed that his employment history, aptitude as a transmission mechanic, and other characteristics were not those of a mentally retarded person.

¶ 32 Harris argues that this Court cannot dispose of this claim using the prejudice analysis above. He admits the test for ineffective assistance of counsel is whether there is a reasonable probability that, but for counsel's unprofessional errors, the results of the trial would have been different.[56] Regarding this claim, the different result would have been a finding of mental retardation and ineligibility for the death penalty. Thus, the Court is required to review the record to see whether, had counsel requested a hearing, Harris would have prevailed on his claim of mental retardation. There is no support in the record for such a conclusion. However,

---

48. *Rompilla,* 545 U.S. at 380–81, 125 S.Ct. at 2462; *Wiggins,* 539 U.S. at 523, 123 S.Ct. at 2536; *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *Hooks v. State,* 2001 OK CR 1, 19 P.3d 294, 317.

49. *Browning,* 134 P.3d at 831; *Ryder v. State,* 2004 OK CR 2, 83 P.3d 856, 874–75.

50. *Williams,* 529 U.S. at 393, 120 S.Ct. at 1513 (defendant prejudiced where counsel's actions deny him a substantive or procedural right to which he is entitled by law); *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Hooks,* 19 P.3d at 317.

51. *Blonner v. State,* 2006 OK CR 1, 127 P.3d 1135, 1139–40; *State ex rel. Lane v. The Hon. Jerry D. Bass,* 2004 OK CR 14, 87 P.3d 629, 633; *Murphy v. State,* 2002 OK CR 32, 54 P.3d 556, 567.

52. *Blonner,* 127 P.3d at 1139.

53. All the experts for both the State and defense agreed that these IQ test results, taken during pretrial proceedings and while there were doubts raised as to Harris's competency, were less reliable than his other test scores, which were over 70.

54. *Murphy,* 54 P.3d at 566.

55. One expert did testify at the competency hearing that, based on the two low scores, he believed he had to say Harris was mildly mentally retarded, but that was not his conclusion after examining Harris and he found the scores surprising.

56. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

Harris argues that only a jury, not this Court, may make a determination of a defendant's possible mentally retarded status under any circumstances. Harris has misunderstood this Court's jurisprudence on this issue. In a series of cases involving retroactive capital post-conviction procedures, this Court has declined to make an initial finding of fact regarding mental retardation, remanding for jury determination the question of whether a capital defendant, convicted and currently on Death Row, is mentally retarded.[57] That is not the issue here. The issue is whether, on this record, Harris's counsel was ineffective for failing to ask for a pretrial determination of mental retardation. Nothing in this record shows that, had counsel made that request, evidence would have shown by a preponderance of the evidence that Harris was mentally retarded. There is a great deal of evidence in the record to show otherwise, including the opinion of several experts who testified that Harris was not mentally retarded. We cannot conclude there was a reasonable probability that, but for counsel's omission, the results of this resentencing proceeding would have been different.

¶ 33 In Proposition II Harris claims that trial counsel was ineffective for failing to present evidence of diminished mental capacity and probable mental illness. This evidence was available to counsel or easily discoverable, and much of it was presented at Harris's first trial. Trial counsel has a duty to investigate and present relevant mitigating evidence.[58] However, where counsel makes an informed decision to pursue a particular strategy to the exclusion of other strategies, this informed strategic choice is "virtually unchallengeable".[59] We have noted that among counsel's basic duties is "to make informed choices among an array of alternatives, in order to achieve the best possible outcome for the client." [60] The United States Supreme Court has found counsel ineffective where the failure to thoroughly investigate and present mitigating evidence "resulted from inattention, not reasoned strategic judgment." [61]

¶ 34 At Harris's resentencing trial, defense counsel presented mitigating evidence through Harris's sister, brother, former coworker and employer, son-in-law, and two daughters. His most extensive mitigating evidence was presented through Dr. Draper, an expert witness in developmental analysis. Dr. Draper testified extensively regarding the developmental processes that led Harris to commit these crimes. She began by discussing his tumultuous and abusive childhood. She described his medical problems throughout childhood as well as his learning disabilities, low intelligence, and academic and social problems in school, including schoolyard fights. Dr. Draper described how, during Harris's teenage years, his father taught him to be a transmission mechanic but also taught him to use drugs and alcohol regularly. Dr. Draper discussed the very negative effect on Harris of his mother's lingering death from cancer, the death of his grandparents, and the family's separation. She testified regarding Harris's brief first marriage. Dr. Draper noted that Harris's first wife had alleged he was abusive and filed for a victim's protective order and divorce, but said Harris's first wife told her that Harris did not abuse her and she had said otherwise because she wanted to leave him. Dr. Draper told jurors of Harris's at-

57. *See, e.g., Pickens v. State*, 2005 OK CR 27, 126 P.3d 612, 616; *Lambert v. State*, 2005 OK CR 26, 126 P.3d 646, 650; *Murphy v. State*, 2005 OK CR 25, 124 P.3d 1198, 1208.

58. *Rompilla*, 545 U.S. at 380–81, 125 S.Ct. at 2462; *Wiggins*, 539 U.S. at 523, 123 S.Ct. at 2536; *Williams*, 529 U.S. at 393, 120 S.Ct. at 1513; *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2052. *See also Garrison v. State*, 2004 OK CR 35, 103 P.3d 590, 619 (appellate counsel's failure to adequately participate in evidentiary hearing on ineffective assistance of trial counsel, waiving the issue, was itself ineffective where trial counsel had failed to investigate or present mitigating evidence).

59. *Jones v. State*, 2006 OK CR 5, 128 P.3d 521, 535, *cert. denied*, —— U.S. ——, 127 S.Ct. 404, —— L.Ed.2d ——, quoting *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066. *See also Thacker v. State*, 2005 OK CR 18, 120 P.3d 1193, 1195 (presumption of sound trial strategy has highly deferential review).

60. *Jones*, 128 P.3d at 535.

61. *Wiggins*, 539 U.S. at 526, 123 S.Ct. at 2537.

tempt at suicide when his first wife left him. She explained that for several years Harris and Pam had custody of his daughters, and described his love for his daughters as well as his inability to engage emotionally as a parent. She described his relationship with Pam, including a mutual pattern of verbal and emotional abuse. Dr. Draper showed jurors how Harris depended on Pam emotionally and professionally.

¶ 35 Throughout her testimony Dr. Draper emphasized that Harris's chaotic and troubled background resulted in extreme emotional instability. She discussed how his low intelligence and chronic substance abuse contributed to his inability to handle stress or resolve problems. She described Harris's reliance on Pam, and his feelings of despair and devastation when Pam left him. Dr. Draper also emphasized Harris's anger at his situation, and at the loss of his tools, and his inability to control or appropriately express his anger. She testified that this inability was caused by Harris's immaturity, emotional instability, poor judgment, and confusion. She noted his expressions of remorse for Merle Taylor's death, while agreeing that Harris still blamed Pam for leaving him and causing him to commit the crimes. She discussed psychological methods of predicting future violence, and testified that in a controlled environment, medicated, without access to controlled substances and without a romantic partner, she did not believe Harris would be dangerous. Dr. Draper testified that Harris had been diagnosed as mentally ill and was on psychotropic medications in jail. She stated that she did not further explore the area of mental illness because those diagnoses had been made after the crimes occurred, and her focus was on explaining Harris's actions and symptoms of underlying difficulties which led to the crimes. However, her observations of Harris's behavior were consistent with the diagnoses.

¶ 36 After Dr. Draper testified, counsel attempted to have a representative from the jail testify regarding the medications Harris took for his mental conditions. Counsel failed to give notice of this testimony to the State. The trial court noted that mere evidence Harris was on medication would encourage jury speculation regarding Harris's mental condition. Harris argues that this attempt shows counsel realized he had erred in failing to present evidence of mental illness.

¶ 37 Harris complains that counsel failed to present extensive evidence regarding his mental state and diagnoses of mental illness. Most of this evidence was presented at Harris's first trial or his competency proceedings, and was readily available to counsel. A significant portion of this evidence was presented at the first stage of Harris's original trial, to argue his mental state could not support a finding of malice, rather than as evidence in mitigation. After the crimes, questions were raised regarding Harris's competency. At one point he was sent to Eastern State Hospital, received treatment and medication, and was declared competent. Doctors representing the court, the State, and the defense examined Harris throughout the pretrial proceedings. He received several diagnoses of mental illness: bipolar disorder with psychotic features, schizo-affective disorder, depressive with psychotic features. Experts agreed at the very least Harris was clinically depressed. They all also noted his low intelligence. One expert for the State, and the doctors at Eastern State Hospital, suspected Harris was either malingering or exaggerating his mental condition. One defense expert testified that, based on his contact with Harris shortly after the crimes, Harris was probably suffering from mental illness at the time of the crimes. Nobody believed that Harris's mental illness, even if present when the crimes were committed, rendered him legally insane; the experts agreed that Harris knew right from wrong and understood the consequences of his actions. Harris's experts described the connection his mental illness and chronic substance abuse may have had with the crimes. They testified that as a consequence of his mental state, Harris was low functioning and emotionally unstable, unable to solve problems or take action towards goals, highly agitated and angry. At the first trial, Harris's expert on future dangerousness testified that he could not say Harris would not be a danger to society; he did say that, in a

controlled environment and with medication, Harris would present less danger than otherwise.

¶ 38 After thoroughly considering the evidence which was presented at Harris's resentencing trial, and the evidence which was presented earlier and could have been presented, this Court concludes that counsel was not ineffective. Counsel was aware of the evidence of mental condition and status. Rather than rely on it to persuade jurors that Harris's mental state and after-diagnosed mental condition were mitigating circumstances, counsel chose a different path. He called Dr. Draper to testify regarding Harris's development over his life. This evidence was comprehensive. It included Harris's troubled and abusive childhood, his low IQ and trouble in school, his difficulty with marital relationships, his relationships with his family and daughters, his dependency on Pam, the mutually abusive nature of that relationship. Dr. Draper also discussed Harris's chronic substance abuse which began when he was a teenager with his father, his poor judgment, anger and inability to solve problems, and his extreme emotional instability. She also discussed the likelihood that, based on his past behavior and mental state, Harris would be a danger in the future. While Harris's specific diagnoses of mental illness were not presented to the jury, jurors were told he had been diagnosed as mentally ill. Those diagnoses were made after the crimes, and Dr. Draper did describe the highly emotional mental state Harris was in at the time of the crimes. Dr. Draper used all this evidence to explain why Harris could not accept his circumstances and resorted to murder.

¶ 39 Harris claims that the prejudice from this decision is evident. At the first trial, jurors heard much of this evidence. During deliberations, they asked a question about the type of prison in which Harris might serve a sentence of imprisonment. The trial court's answer to this question, which was inaccurate as a matter of law, resulted in the case's reversal and this resentencing trial.[62]

Harris contends this indicates that his first jury seriously considered imposing a sentence of less than death, and claims that, had the evidence been presented again, his resentencing jury would have done the same. This Court cannot speculate as to why Harris's first jury asked their question, or what its sentencing intent might have been. Counsel chose to provide Harris's resentencing jury with a thorough picture of his life, intelligence, and emotional state, including his anger, grief and despair immediately preceding the crimes. Through Dr. Draper, jurors heard evidence which encompassed or incorporated some of the evidence presented at the first trial. We will not second-guess counsel's reasoned strategic judgment. Counsel's choice of mitigating evidence did not amount to ineffective assistance.

¶ 40 In Proposition XI Harris raises several claims of ineffective assistance of counsel. He fails to show any prejudice from counsel's alleged omissions, and we will not find counsel was ineffective.

¶ 41 Harris first notes that counsel failed to object to errors raised in previous propositions, and asks that those be reviewed for ineffective assistance of counsel. As we have found no error in the previous propositions, counsel cannot be ineffective for failing to raise objections to issues contained therein.[63] Harris also claims counsel failed to conduct a thorough and independent investigation of his case. We found in Propositions I and II that counsel was not ineffective for failing to claim Harris was mentally retarded, or for failing to present the evidence of mental status and mental illness raised in his first trial and competency proceedings. Relying on the issues raised in Propositions I and II, Harris claims that counsel failed to independently investigate the case as previously developed in order to satisfactorily conclude that the extant evidence was viable and reliable. This appears to be speculation, as the record does not support this allegation.

¶ 42 Harris also claims that counsel failed to present evidence directly bearing on the continuing threat aggravating circum-

---

62. *Harris,* 84 P.3d at 757.

63. *Williams,* 529 U.S. at 393, 120 S.Ct. at 1513; *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

stance. In fact, Dr. Draper did discuss methods for predicting future dangerousness, and gave her opinion that Harris would not be a future danger to society. Harris argues that counsel should have presented an expert on risk assessment, who could have provided an accurate and scientifically sound analysis of the exact likelihood that Harris would be a future danger. The experts who testified at Harris's first trial, and Dr. Draper, all testified that he was in fact likely to pose a risk of future danger. Harris's experts testified that, under particular circumstances likely to be found in prison, that risk was significantly lessened, but they all agreed that Harris posed more risk to the general population than the average person. Given this evidence, we will not say counsel was unreasonable for choosing not to stress the issue of Harris's potential for danger to society by using risk assessment evidence.[64]

¶ 43 This proposition is accompanied by an Application for Evidentiary Hearing. To support his claim that counsel did not conduct a thorough independent investigation, Harris provides an affidavit with a psychological evaluation conducted after the trial ended. As he notes in his brief, this evaluation is consistent with other psychological evaluations which were available to counsel. To support his claim that counsel failed to present evidence bearing on the continuing threat aggravating circumstance, Harris offers an affidavit containing a risk assessment profile. This profile reaches a similar conclusion to that of Dr. Draper and other experts—in a controlled, structured environment, medicated, without access to controlled substances, and without a romantic relationship such as that with Pam, Harris poses little threat to society. The application for evidentiary hearing and supplemental materials do not contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to use or identify the evidence.[65] Harris's Application for Evidentiary Hearing is denied.

## Cumulative Error

¶ 44 In Proposition XII Harris claims that the accumulation of errors in the preceding propositions requires relief. In Proposition III, we found the trial court erred in failing to bring the jury into open court when a question was presented in deliberations, but that error was harmless. In Proposition VI we found that error in argument was cured by instructions. Even taken together, these errors do not require relief.[66]

## Mandatory Sentence Review

■ ¶ 45 We must determine (1) whether the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's findings of aggravating circumstances.[67] Upon review of the record, we cannot say the sentences of death were imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor.

¶ 46 The jury was instructed on and found the existence of two aggravating circumstances: (1) the defendant knowingly created a great risk of death to more than one person, and (2) there existed a probability that Harris would commit criminal acts of violence which would constitute a continuing threat to society. Harris presented evidence that he was abused and neglected as a child, suffered the death of his mother as a teenager, had low intelligence, was a chronic substance abuser, was mentally ill, and was very dependent on Pam Harris; that he had no prior convictions, had no misconduct citations in prison and only one while incarcerated in jail, had a good prison record and could live within prison society; that his family loved and needed him and he was remorseful for his actions. The jury was specifically instructed on thirteen mitigating factors, and invited to consider other mitigating evidence

**64.** *Jones,* 128 P.3d at 535; *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066.

**65.** Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2007).

**66.** *Browning,* 134 P.3d at 846.

**67.** 21 O.S.2001, § 701.13(C).

they might find.[68] Upon our review of the record, we find that the sentences of death are factually substantiated and appropriate.

¶ 47 Jimmy Dean Harris was tried by jury and convicted of Murder in the First Degree, in the District Court of Oklahoma County, Case No. CF–1999–5071, resentenced to death, and appeals. The Sentence of the District Court is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2007), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

LUMPKIN, P.J.: concur in results.

C. JOHNSON, V.P.J., A. JOHNSON and LEWIS, JJ.: concur.

**68.** Harris had no prior convictions; had no reported misconduct as a Department of Corrections inmate; had a lifelong addiction to drugs and alcohol beginning at age 14; Harris was continuously confined from September 9, 1999, to the date of trial, but had only one misconduct write-up in the Oklahoma County Jail; on the morning of the crimes Harris was overwhelmed by the powerful emotions of anger and fear of life without Pam Harris; was capable of living cooperatively within prison society; was diagnosed with a low I.Q. which made it difficult for him to solve problems; Harris has a sister and brother who love him; has daughters who love and need him; is remorseful for what he did and the pain he caused the Taylor family and his own family; his mental condition, alcoholism and drug abuse combined with strong emotions led to his decision to bring a gun to AAMCO Transmission and murder Taylor; as a young child Harris was beaten by his father and neglected by both parents; Harris's mother, the one adult who consistently loved him, died of cancer when he was a teenager. Instruction No. 9.