2011 OK CR 26

**James Lawrence MITCHELL, III, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. D–2008–582.

Court of Criminal Appeals of Oklahoma.

Oct. 13, 2011.

Jason Spanich, Heidi Baier, Assistant Public Defenders, Oklahoma City, Oklahoma, counsel for appellant at trial.

David Prater, District Attorney, Suanne Carlson, Gayland Gieger, Assistant District Attorneys, Oklahoma City, Oklahoma, counsel for the State at trial.

James H. Lockard, Deputy Division Chief, Traci J. Quick, Capital Direct Appeals Division, Oklahoma Indigent Defense System, Norman, Oklahoma, counsel for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, Oklahoma, counsel for the State on appeal.

## OPINION

LUMPKIN, Judge.

¶ 1 James Lawrence Mitchell, III, Appellant, was tried by a jury and convicted of Murder in the First Degree, Child Abuse, (21 O.S.Supp.1998, § 701.7(C) and Child Abuse, After Former Conviction of Two Felonies (10 O.S.Supp.2000, § 7115) in the District Court of Oklahoma County, Case No. CF–2000–4712. In the sentencing stage, the jury found the existence of two (2) aggravating circumstances: (1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; and 2) the murder was especially heinous, atrocious or cruel, and recommended the sentence of death. The jury recommended a sentence of life in prison for the conviction of Child Abuse. The trial judge sentenced Appellant in accordance with the jury's determination, ordering the sentences to be served consecutively.[1] Appellant now appeals his convictions and sentences.[2]

¶ 2 Shawanda Rogers and Michael Frerene moved to Oklahoma City from Louisiana in December 1998. They brought with them their 20 month old daughter Charita (also referred to as the decedent) and Rogers' 4 year old son, Kyree. In the spring of 2000, Frerene returned to Louisiana for a couple of months. During that time, Rogers worked at a McDonald's restaurant where she met Appellant, a fellow co-worker.

¶ 3 In July 2000, Rogers, Charita and Kyree moved in with Appellant. By that time, Rogers worked at the Fifth Seasons Hotel. While she worked Appellant stayed home with the children. Around 8:00 a.m. on July 23, 2000, Appellant drove Rogers to work. As early as 8:15 a.m., Appellant made the first of many phone calls to the hotel. Initially, he spoke to one of Rogers' co-workers and told her it was important for Rogers to call home. In the third or fourth call, Appellant told the same co-worker that Rogers' baby was sick and she needed to call home. The fifth or sixth time Appellant called, somewhere between 10:30 and 11:00 a.m., he said Rogers needed to come home because her baby was having a seizure. The hotel employee told Appellant to take the baby to the hospital. Appellant, however, continued to call the hotel for Rogers. Even though Rogers' co-workers repeatedly told her she needed to go home and check on her baby, she did not leave until she had completed her shift. Appellant picked her up from work between 2:30 and 3:30 p.m.

¶ 4 After Rogers and Appellant returned home, Rogers called her aunt Gwen and told her Charita was having seizures. Rogers asked for a ride to the hospital despite the fact Appellant had an available car, having just picked Rogers up from work; they lived only blocks from the hospital; and Aunt Gwen lived on the other side of town. Rogers was told to call an ambulance, but insisted on being driven to the hospital. At her aunt's direction, Rogers' Uncle Kevin, accompanied by Michael Frerene, who knew where Appellant lived, drove over and picked up Rogers and both children and took them to the hospital.

¶ 5 When they arrived at the emergency room at 4:20 p.m., Charita was essentially comatose. Medical personnel found she was in respiratory failure and was having seizures. She had widespread bruising from head to toe with areas of denuded skin on her buttocks, hands and fingers. Some of the bruised areas and marks on her body were in the form of a loop. She also had two areas resembling bite marks and retinal hemorrhages.

---

1. Appellant was previously tried in 2003 and convicted of the crimes charged herein, as well as the sexual abuse of the decedent. He was sentenced to death for the murder and one thousand (1000) years in prison for each of the abuse counts. On appeal, this Court reversed the murder and child (physical) abuse convictions and remanded those counts for a new trial. The conviction for Child Sexual Abuse was reversed with instructions to dismiss. *See Mitchell v. State*, 2005 OK CR 15, 120 P.3d 1196.

2. Appellant's Petition in Error was filed in this Court on November 12, 2008. His brief was filed June 17, 2009. The State's brief was filed on November 13, 2009. The case was submitted to the Court on November 20, 2009. Appellant's reply brief was filed December 3, 2009. Oral arguments were held on November 2, 2010.

¶ 6 A CT scan of her head showed bleeding in her brain and blood tracking in the area separating the upper part of the brain from the area that controls balance. Massive swelling of the left side of her brain was pushing her brain over the falx and causing herniation of the brain stem. These multiple significant brain hemorrhages indicated that Charita had suffered more than one strike injury to her head. The injuries suggested Charita was shaken and struck and that her head was hit against something or something was used to strike her head. The CT scan of Charita's abdomen showed swelling around her liver, possible injury to her spleen and pancreas, and bleeding in her left kidney.

¶ 7 Charita's bruises continued to evolve while she was in the Emergency Room which indicated to medical personnel that her injuries were relatively acute and probably occurred within one (1) to six (6) hours of presentation to the hospital. After the abdominal CT scan, Charita stopped breathing on her own and was taken to the Pediatric Intensive Care Unit (PICU). By the time she arrived in the PICU, she had no evidence of brain or brain stem function. She was pronounced dead the following day, July 24, 2000, about 3:30 p.m.

¶ 8 Dr. Haynes, who saw Charita in the Emergency Room, and Dr. Gessouroun, the PICU physician who examined Charita on July 24th, both testified her internal injuries and lung injuries were caused by external trauma. The doctors agreed that the injuries to her lungs, pancreas and liver would have required blunt force trauma to her chest and abdomen and were inconsistent with a fall or an accident. In the absence of a high speed car accident, her injuries would have required several different impacts. Noting the patterned bruises and the multiple areas of bleeding in her brain, the doctors testified it was very unusual to have such bleeding in the brain in the absence of very extreme force. They said Charita had such massive trauma to her head that she would not have had a lucid period or normal or near normal level of functioning between the time of the lethal injury and the time she would have developed symptoms of brain injury. After receiving the fatal blow, she would not have been able to talk, eat, or play. Dr. Gessouroun testified he believed her injuries were inflicted the morning of July 23rd, at a time consistent with 11:00 a.m., when she was first reported to have started having seizures. Dr. Gessouroun believed she died from child abuse.

¶ 9 Because of Charita's severe injuries, her brother Kyree was also examined. He told Dr. Casax that he was not hurt or in pain, but Dr. Casax saw looped or horseshoe like bruises on his right arm, thigh, buttocks and upper back. She suspected the bruises were consistent with child abuse. Dr. Casax admitted the bruises could be within one day to one month old and stated the injuries were not life-threatening.

¶ 10 Appellant voluntarily spoke with Oklahoma City Detective Willie Edwards on July 25, 2000. Detective Edwards testified Appellant initially did not admit he was responsible for any injuries to Charita or Kyree. He blamed Rogers for the abuse. He said Rogers hit Charita on the head with a telephone on July 22nd and said Kyree stuck Charita's fingers in the fan. Detective Edwards said Appellant's story changed during the interview. Appellant said he heard Charita fall off the bed after he returned from taking Rogers to work. Then he said he spanked Charita with a belt because she and Kyree were fighting. Finally, Appellant said he lost control and blacked out.

¶ 11 Appellant also told Detective Edwards that on July 23, Charita started having seizures around 10:00 to 10:30 a.m. He said Charita was playing with Kyree before that time. Detective Edwards testified he knew that Charita's severe brain injuries would have rendered her unable to play, so he believed 10:00 to 10:30 a.m. was probably when the fatal injuries occurred. Other relevant facts will be discussed as necessary.

¶ 12 Appellant raises nineteen (19) propositions of error in his appeal. These propositions will be addressed in the order in which they arose at trial.

## PRE–TRIAL ISSUES

¶ 13 In his fourth proposition of error, Appellant contends that his Fifth

Amendment right to counsel was violated by the trial court's overruling of his motion to suppress his in-custody statements. Appellant argues that after invoking his right to counsel, he did not voluntarily reinitiate questioning and any statements made after his invocation of counsel were inadmissible. We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Gomez v. State*, 2007 OK CR 33, ¶ 5, 168 P.3d 1139, 1141.

¶ 14 "The United States Supreme Court, in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), discussed the Fifth Amendment protection against compelled self-incrimination which provides the accused with the right to have counsel present at custodial interrogations." *Walker v. State*, 1990 OK CR 44, ¶ 9, 795 P.2d 1064, 1066. Once the Fifth Amendment right to counsel is invoked, the defendant is not subject to further questioning unless the defendant has counsel or reinitiates interrogation with law enforcement personnel. *Sattayarak v. State*, 1994 OK CR 64, ¶ 5, 887 P.2d 1326, 1329, *citing Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). "Once counsel has been requested, questioning must cease and officers may not initiate contact without counsel present whether or not a defendant has consulted with counsel." *Id., citing Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). Interrogation is reinitiated when a defendant represents a desire to open up a more generalized discussion relating directly or indirectly to a criminal investigation: routine inquiries arising from the incidence of custodial relationship, such as requests for a telephone or drink of water, do not reinitiate questioning after a defendant has invoked the right to counsel. *Id., citing Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). The prosecution bears the burden of proving whether the waiver was knowing and intelligent under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities. *Sadler v. State*, 1993 OK CR 2, ¶ 29, 846 P.2d 377, 384. *See also State v. Pope*,

2009 OK CR 9, ¶ 9, 204 P.3d 1285, 1287–1288; *Ullery v. State*, 1999 OK CR 36, ¶ 15, 988 P.2d 332, 342.

¶ 15 In Appellant's first trial, a *Jackson v. Denno* [3] hearing was held on the admissibility of his statements to Detective Edwards. The trial court reviewed the videotape of Appellant's interview with Detective Edwards and took testimony from Edwards. The defense cross-examined Edwards, but offered no evidence in support of the motion to suppress. The trial court overruled the motion to suppress, stating that invocation of counsel does not prevent further interrogation if the defendant re-initiates the conversation.

¶ 16 At his second trial, Appellant again sought a hearing on the admissibility of his statements and the trial court agreed to look at the videotape. The prosecution asked the court to review the testimony of Detective Edwards from the original hearing rather than repeating the entire hearing. The trial court agreed, but advised the parties that if there was something that was not in the prior hearing transcript, they should advise the court. Defense counsel neither objected to this procedure nor offered any additional testimony or evidence.

¶ 17 Just before *voir dire* and the start of trial, the court addressed the admissibility of Appellant's statements. Noting it had reviewed the videotape, the court said that Appellant had invoked his right to counsel "and then he called him back in and started over." The court further stated:

He says in that that he wanted to talk to him and the detective said, you don't want to? He said, I do want to, when he called him back in, kicked on the door—or knocked on the door to get him to come back in. So—and it's pretty clear, really, so I'm going to overrule your motion to suppress that portion.

¶ 18 Appellant disagrees with the trial court's interpretation of the taped statement and argues that he said he did not want to talk with the detective. Appellant argues that despite the fact he never expressed any specific intent to waive his right to an attor-

3. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

ney and talk to Edwards, the detective continued to press him for details. Appellant asserts in the alternative that to the extent he told Detective Edwards he wanted to talk with him further, he did not want to talk about the criminal investigation but was asking to be allowed to speak to his family, "his people".

¶ 19 Having reviewed the videotaped statement, we find the trial court did not abuse its discretion in its determination that Appellant re-initiated conversation with Detective Edwards about the investigation into the decedent's death. The tape clearly shows Appellant's unequivocal request for counsel. Appellant then tells Detective Edwards to get in contact with his attorney and tell "his people" on the second floor. The tape shows Detective Edwards left the interview room and returned a few minutes later to place Appellant under arrest. Edwards told Appellant he was under arrest for homicide, handcuffed Appellant and left the room without further comment.

¶ 20 Edwards subsequently responded to a knock on the inside of the door to the interview room. Edwards asked Appellant what he needed. While his response is not clear, Appellant appears to reply, "I don't want to talk you, man." Edwards responded, "You don't want to talk to me?" Appellant made an inaudible reference to his "family", his "people" and Edwards then told him they "can't come right now to you." Appellant then asks Edwards, "why is you arresting me, man?" Edwards replies it's because he thinks Appellant "lost it" and "killed that baby", adding "I can't talk to you about this now you requested your attorney unless you want to talk to me about it." Appellant continued to talk with Edwards, arguing that the evidence did not show that he killed the decedent but the police were going to believe what they wanted to believe.[4]

¶ 21 Based upon this record, we find Appellant voluntarily reinitiated communication with Detective Edwards and waived his *Miranda* rights after he had previously asserted his right to counsel. Appellant's continued discourse with the detective about the investigation into the decedent's death, even after he had been informed that since he had invoked his right to counsel, the detective could not talk with him further unless Appellant wanted to talk to the detective, render Appellant's subsequent statements voluntary and admissible under the Fifth Amendment to the United States Constitution. This proposition is denied.

¶ 22 Appellant contends in his seventh proposition of error that the trial court abused its discretion in failing to *sua sponte* sever for trial the count of child abuse involving Kyree from the first degree murder count involving Charita. In support, Appellant points to footnote 21 in his first appeal where this Court said, "[o]n retrial, the prejudicial effect of joinder of these offenses should be considered". *Mitchell*, 2005 OK CR 15, ¶ 77, 120 P.3d at 1215, n. 21.[5] Appellant asserts that he was prejudiced by the joinder as evidence that he abused Kyree was extremely weak and insufficient to convict him if tried separately.

¶ 23 Joinder of offenses is permitted pursuant to 22 O.S. 2001, § 438. This section provides that multiple offenses may be combined for trial "if the offenses could have been joined in a single indictment or information" This Court has allowed joinder of separately punishable offenses allegedly committed by the accused if the separate offenses "rise out of one criminal act or transaction, or are part of a series of criminal acts or transactions." *Lott v. State*, 2004 OK CR 27, ¶ 34, 98 P.3d 318, 333 *quoting Glass v. State*, 1985 OK CR 65, ¶ 8, 701 P.2d 765, 768. When there is a series of criminal acts or transactions, "joinder of offenses is proper where the counts so joined refer to the same type of offenses occurring over a relatively short period of time, in approximately the

---

4. This interpretation of the statements on the video is supported by the transcript of the video. This transcript was used in the prior trial but was not admitted in the present trial.

5. The record reflects that in pre-trial motion hearings, defense counsel stated he was aware of this Court's admonition and that the defense was "probably going to file a motion to sever out that count". However, a review of the record shows no such motion was ever filed.

same location, and proof as to each transaction overlaps so as to evidence a common scheme or plan." *Id.*

¶ 24 Offenses may be severed for trial when either the prosecution or the defense appears to be prejudiced. 22 O.S.2001, § 439. The decision to grant or deny severance is within the discretion of the trial court, and this Court will not disturb its ruling on appeal absent a clear showing of abuse of that discretion. *Brewer v. City of Tulsa,* 1991 OK CR 59, ¶ 13, 811 P.2d 604, 607. To establish an abuse of discretion, the appellant must factually demonstrate that the denial of severance deprived him of a fair trial, not merely that a separate trial might have offered him a better chance of acquittal. *Gates v. State,* 1988 OK CR 77, ¶ 24, 754 P.2d 882, 887–888.

¶ 25 In the present case, Appellant was charged with physically abusing Kyree and Charita at approximately the same time and at the same location. The two crimes were similar offenses of child abuse, except that one of the cases resulted in the decedent's death.

¶ 26 Further, Appellant has not shown that he was prejudiced by the joinder. There was substantial evidence relevant to both counts. The evidence showed that Appellant hit both children that Sunday morning with his hand, a belt, and a wire handle from a flyswatter or hanger. Kyree's testimony was relevant to both counts. Appellant's pre-trial statements to Detective Edwards were relevant to both counts. Evidence showing that the lethal injuries to Charita were committed while Appellant was her sole caretaker was probative in showing that Kyree's injuries, which showed the same loop pattern as Charita's injuries, occurred at about the same time and corroborated Kyree's testimony that Appellant beat both children that same morning. Appellant's defense to both crimes was the same—that there was a doubt whether the evidence showed the injuries occurred when

Appellant had exclusive custody and that Shawanda Rogers could have been the perpetrator.

¶ 27 The trial court fully instructed the jury that Appellant was presumed innocent of each offense, that each offense was to be given separate consideration, the verdict on each offense was to be based on the law and evidence applicable to that offense and that the State had the burden of proving guilt beyond a reasonable doubt.

¶ 28 Under these circumstances, Appellant has failed to show that he was prejudiced by the joinder, nor do we discern any actual prejudice from our review of the record.[6] As we find the trial court did not abuse its discretion in failing to sever the counts for trial, this proposition of error is denied.

### JURY SELECTION ISSUES

¶ 29 In his second proposition of error, Appellant contends that during *voir dire,* the trial court erred in instructing the venire on the State's burden of proof and by defining, and allowing the prosecutor to define, reasonable doubt. Appellant directs us to comments by the trial court that the defendant "is presumed to be not guilty"; that at the start of trial, the defendant "starts off even", that he was "no more guilty" than any of the veniremen and if they had to vote at that point, it would have to be not guilty. The court also advised the jury that the burden was on the State to prove guilt beyond a reasonable doubt, stating, "[w]e can't tell you what that is. It's the highest level—highest burden in the law." The court then attempted to tell the jury what it was not, "[it's] not a guess or a maybe or a probably, okay ... You make a conscientious evaluation of the evidence." Appellant faults the court for distinguishing "beyond a reasonable doubt" from "moral certainty" or "absolutely positive". Later in the proceedings, the court commented that reasonable doubt was "not a positive and it's not a guess".

6. Contrary to Appellant's argument, we did not hold in Appellant's prior appeal that the joinder of the two offenses was prejudicial under Oklahoma law. We only noted the prejudicial effect on the jury of knowing about Charita's injuries was evident by the one thousand year sentence

recommended by the jury for the abuse of Kyree. 2005 OK CR 15, ¶ 77, 120 P.3d at 1215, n. 21. That prejudice was based upon improperly admitted evidence and insufficient jury instructions on the offense of child abuse, errors which did not occur during the re-trial.

¶ 30 Appellant also refers to comments by the prosecution that it was up to the jury to decide what beyond a reasonable doubt meant and whether the State proves its case beyond a reasonable doubt. The prosecutor stated, "the law allows me to tell you what it doesn't mean .... it's something less than beyond all doubt, beyond a shadow of a doubt, but that's about as far as I can go, okay? The rest of this is up to you."

¶ 31 Appellant did not raise an objection to any of these comments. Therefore we review only for plain error. *See Romano v. State,* 1995 OK CR 74, ¶ 54, 909 P.2d 92, 115. We look at the entire record to determine whether the cumulative effect of any improper comments by the prosecutor prejudiced Appellant, constituting plain error. *Id.*

¶ 32 In *Flores v. State,* 1995 OK CR 9, ¶¶ 11–12, 896 P.2d 558, 562, cited by Appellant, this Court found reversible error in the trial court's written instruction advising the jury that the defendant was "presumed not guilty". This Court found that the deviation from the uniform instruction amounted to an "impermissible lessening of the burden of proof by expanding the degree of doubt that is permissible" and that the "error was not cured by any other instructions specifically, an appropriate burden of proof instruction". 1995 OK CR 9, ¶ 11, 896 P.2d at 562.

¶ 33 The present case is clearly distinguishable. Here, the comment was verbal and not a written instruction. Further, it was an isolated comment. Numerous other times the court specifically referred to the defendant's "presumption of innocence" or said that the defendant was "presumed innocent". In fact, immediately before the challenged statement, the court said, "Mr. Mitchell has the presumption of innocence". Contrary to Appellant's argument, these correct statements of the law ameliorated the effect of any earlier misstatements and when considered within the context of the court's entire comments on *voir dire,* did not impermissibly lessen the State's burden of proof.

¶ 34 As for comments by the court and the prosecutor concerning reasonable doubt, this Court has long disapproved of attempts to define reasonable doubt for the jury. *See Phillips v. State,* 1999 OK CR 38, ¶ 22, 989 P.2d 1017, 1028 (and cases cited therein). "This Court has stated numerous times that reasonable doubt is self-explanatory, and therefore definitions thereof do not clarify the meaning of the phrase, but rather tend to confuse the jury." *Id. See also Al-Mosawi v. State,* 1996 OK CR 59, ¶ 27, 929 P.2d 270, 279 (specifically applying principle to comments made in *voir dire).* In determining whether the comments in a particular case were error, and if that error could be considered harmless, we have generally viewed the comments in context of the entire *voir dire* and the written instructions. *See Stouffer v. State,* 2006 OK CR 46, ¶ 31, 147 P.3d 245, 259; *Al–Mosawi,* 1996 OK CR 59, ¶¶ 25–27, 929 P.2d at 279; *Romano,* 1995 OK CR 74, ¶¶ 54–55, 909 P.2d at 115. In the present case, we find no plain error. The comments were attempts to "dispel commonly held attitudes and often heard phrases" rather than attempts to define reasonable doubt. *Phillips,* 1999 OK CR 38, ¶ 22, 989 P.2d at 1028.

¶ 35 Additionally, while Appellant has not challenged the written instructions given to the jury at the close of evidence for failing to clearly express his presumption of innocence and the State's burden of proof, we have reviewed the instructions and find they correctly stated the applicable law. Based upon the entire record, we find Appellant was not prejudiced by the challenged comments.

¶ 36 Finally, Appellant asks this Court to adopt a uniform instruction defining reasonable doubt. This argument was rejected in *Romano,* 1995 OK CR 74, ¶¶ 99–101, 909 P.2d at 124–125. *See also Harris v. State,* 2004 OK CR 1, ¶ 51, 84 P.3d 731, 750–751 (appellant presented no persuasive reason why written definition of beyond a reasonable doubt would assist jurors or eliminate confusion). Appellant has not persuaded us to revisit the issue. This proposition of error is denied.

¶ 37 Appellant contends in his fifth proposition of error that he was denied equal protection of the law when the trial court failed to apply the correct legal standard enunciated in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) in

evaluating his objections to the State's use of peremptory challenges to excuse two minority members of the venire. Appellant asserts the case should be remanded in order to address his *Batson* challenge correctly and, if at that time, the prosecutor does not come forward with a race neutral explanation for the use of the peremptory challenges, his conviction should be reversed.

¶ 38 The record reflects the "struck juror" procedure was used to obtain a jury in this case. This method of jury selection has been previously approved by this Court. *See Jones v. State*, 2006 OK CR 5, ¶¶ 9–10, 128 P.3d 521, 533–34. Thirty individuals were initially called for the proposed jury panel. After all challenges for cause were exhausted, the remaining venire were subject to nine peremptory challenges by the State and nine by the defense. All eighteen peremptory challenges were exercised at once, before any veniremen were released. During the exercise of the peremptory challenges, the following occurred:

THE COURT: State's four.

[PROSECUTOR]: Number seven, Mr. F.

[DEFENSE COUNSEL]: For the record, your Honor, we'll make a *Batson* challenge to that.

THE COURT: Make aware that he's black.

[DEFENSE COUNSEL]: And ask for a race neutral reason.

[THE PROSECUTOR]: Judge—

THE COURT: I don't think we've established yet that there's a pattern to do anything.

. . .

THE COURT: State's five.

[THE PROSECUTOR]: Ms. S.

. . .

[DEFENSE COUNSEL]: For the record, we're making a *Batson* challenge as to her. She's a minority, as well, Your Honor.

THE COURT: Okay. You can exercise your rights to do that action.

¶ 39 After each side had exercised its full complement of peremptory challenges, and without any further comment on Appellant's *Batson* challenges, the court excused the challenged veniremen back to the jury assembly room and called up additional veniremen in order to obtain two alternate jurors.

¶ 40 Appellant now argues that the trial court improperly demanded he show a pattern of strikes before he could make a *prima facie* showing and never required the prosecutor to supply race neutral reasons for his two peremptory strikes. The State responds that Appellant failed to meet the first step of *Batson* and the trial court implicitly found that Appellant did not make a *prima facie* showing of purposeful, race-based use of peremptory challenges that would satisfy *Batson*.

¶ 41 The Equal Protection Clause forbids the prosecution from challenging potential jurors solely on account of their race. *Batson v. Kentucky*, 476 U.S. at 89, 106 S.Ct. at 1719. In order to raise an equal protection challenge to the State's use of peremptory challenges, the defendant must first make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. *Coddington v. State*, 2006 OK CR 34, ¶ 11, 142 P.3d 437, 443, *citing Batson*, 476 U.S. at 98, 106 S.Ct. at 1724. Then, the burden shifts to the prosecutor to articulate a race-neutral explanation related to the case for striking the juror in question. *Id.* The trial court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* The trial court's findings are entitled to great deference, and we review the record in the light most favorable to the trial court's ruling. *Id.*

¶ 42 In order to meet the first step and establish a *prima facie* case of purposeful discrimination:

. . . the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other

relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson*, 476 U.S. at 96–97, 106 S.Ct. at 1723 (internal citations omitted).

¶ 43 This Court has rarely been presented with the opportunity to address in much detail the first *Batson* step. In *Guy v. State*, 1989 OK CR 35, ¶ 25, 778 P.2d 470, 476, we recognized the above factors but for purposes of that appeal, assumed without further discussion that the appellant had made out a *prima facie* case of discrimination and discussed in depth the second step of *Batson.* In *Smallwood v. State*, 1995 OK CR 60, ¶¶ 11–14, 907 P.2d 217, 223–224, this Court reiterated the requirements to make a *prima facie* case under *Batson* and found that the defendant had not met his burden of raising an inference that the challenged juror was excluded because of her race. This Court noted there was no pattern of striking minority jurors, the State's explanation for striking the challenged juror was race neutral, and the trial court's observations that the chal-

lenged juror was generally inattentive to the proceedings.

¶ 44 In *Powell v. State*, 2000 OK CR 5, ¶ 44, 995 P.2d 510, 523, we addressed the first step in the *Batson* analysis by stating that the appellant "failed to carry his ultimate burden of establishing a *prima facie* case of purposeful discrimination as defense counsel offered little more than the bare facts that he and the excused juror were both African Americans." [7] This Court further said:

> Counsel pointed to no questions by the State which would create an inference of purposeful discrimination. There is no clear "pattern" of racially-tied strikes. Appellant's own brief essentially admits five of the seven African Americans excused from the jury were removed on proper grounds. The sixth was related to a defense witness. We do not even know how many African Americans were seated among the twelve jurors.

2000 OK CR 5, ¶ 45, 995 P.2d at 523.

¶ 45 In the present case, the record does not support Appellant's contention that the trial court improperly considered only whether there was a pattern of strikes against black jurors in determining whether the first *Batson* step had been met.

¶ 46 "The letter of *Batson* requires the trial court to consider all relevant circumstances surrounding a defendant's *prima facie* showing of discrimination." *Jordan v. Lefevre*, 206 F.3d 196, 201 (2nd Cir.2000). Whether a defendant has made a *prima facie* showing is a question of fact to be decided by the trial judge. *King v. Moore*, 196 F.3d 1327, 1334 (11th Cir.1999). The trial court in this case did not explicitly explain its reasoning for denying Appellant's *Batson* challenges. However, in light of the entire *voir dire* record, the court's sole reference regarding "a pattern to do anything" does not support the argument that a pattern of strikes against black jurors was all the court considered in determining whether a *prima facie* case had been made. Under the

7. *Cf. Grant v. State*, 2009 OK CR 11, ¶ 26, 205 P.3d 1, 14 (defendant generally makes a *prima facie* showing "by simply objecting to the remov-al and pointing out the apparent race of the panelist.").

"struck juror" method of jury selection used in this case, the trial court was able to observe all at once the race of the veniremen which the prosecution excused and the racial makeup of the remaining jurors. The court was able to evaluate the prosecutor's questions and statements during *voir dire* examination in determining whether the exercise of the peremptory challenges implied a discriminatory motive. This method of jury selection gave the trial court a more comprehensive basis for determining whether the prosecution improperly based its peremptory challenges on race. In deferring his decision on Appellant's *Batson* claims until the end of jury selection, and by excusing challenged veniremen without asking for race neutral explanations from the State, the trial court implicitly found Appellant had not made a *prima facie* showing of purposeful discrimination. Therefore, it was not necessary for the court to require the State to provide race neutral explanations for its peremptory challenges. *See U.S. v. Guerrero*, 595 F.3d 1059, 1064 (9th Cir.2010) (if the defense fails to meet step one of *Batson*, there is no need for the district court to continue on to steps two and three).

¶ 47 Further, the trial court did not abuse its discretion in determining that a *prima facie* case of purposeful discrimination had not been established. Appellant has not pointed to any circumstances, such as the prosecutor's questions and statements during *voir dire*, that would raise an inference of a discriminatory purpose. Appellant argues only that the State excused two minority jurors without having to give a race neutral reason for excusing them. Trial counsel did not renew his demand for race neutral explanations after all challenges had been exercised. Further, a reference made later in the trial to the composition of the jury indicates there were four members of a minority race among the twelve jurors who sat in judgment of the case against Appellant.

¶ 48 Pursuant to *Batson*, the trial court properly considered all relevant circumstances in determining that Appellant did not establish a *prima facie* case of purposeful discrimination by the State's exercise of their peremptory challenges. Therefore, it is not necessary to remand the case to the district court for further proceedings regarding Appellant's *Batson* challenges. This proposition is denied.

¶ 49 In his eleventh proposition of error, Appellant asserts it was reversible error for the trial court to fail to provide the jury with the uniform cautionary instructions on the taking of notes and the use of notes during trial and deliberations. Appellant argues the jury was instructed on only a portion of the introductory cautionary uniform instruction, Oklahoma Uniform Jury Instruction–Criminal (OUJI–CR (2d)) 1–9, that notetaking was permitted, but not required, and that they did not receive at all the cautionary instruction to be given at the close of evidence and prior to deliberations, OUJI–CR (2d) 10–8A. Therefore, Appellant asserts, the jury was not told that their notes were only an aid to their memory and should not take precedence over their independent recollection, that the jurors who did not take notes should rely on their own independent recollection of the evidence and not be influenced by the fact that another juror has taken notes, that their notes were for their private use only, that they may only discuss the content of their notes after all sides had rested and deliberations had commenced, and that it was the testimony from the witness stand that must form the basis of their determination of the facts and ultimately their verdict. Appellant argues the trial court's omission violated his Sixth and Fourteenth Amendment rights under the United States Constitution to a fair and impartial jury and therefore his conviction and sentence should be reversed.

¶ 50 Appellant neither requested the uniform instructions be given, nor did he object to the trial court's failure to give them. He has therefore waived all but plain error review. *See Harris v. State*, 2007 OK CR 28, ¶ 5, 164 P.3d 1103, 1107–1108.

¶ 51 Appellant's argument has been raised and rejected previously. *See Harris*, 2007 OK CR 28, ¶¶ 5-6, 164 P.3d at 1107–08; *Hanson v. State*, 2003 OK CR 12, ¶ 5, 72 P.3d 40, 46. In both cases, this Court stated that while trial courts are encouraged to give jurors the uniform instructions where note-

taking is allowed, the failure to do so does not require reversal if the jury is accurately instructed on the law. This Court found no error in either case as the instructions in both cases, when read in their entirety, fairly and accurately stated the applicable law and properly narrowed the jury's discretion to use notes taken during trial.

¶ 52 In the present case, the jury was informed in opening instructions:

If you want to take notes, you may take notes. We have notebooks and pencils back here that will be in your chairs when you come back from break. If you want to, you're not required to. Nobody is grading them. They're not for anybody's use but yourself. You may do that.

¶ 53 The court also informed the jury:

Throughout the trial you should remain alert and attentive. Do not form or express an opinion on the case until it is submitted to you for your decision. Do not discuss this case among yourselves until that time.

¶ 54 As Appellant asserts, this is not the entire uniform instruction. However, the trial court's failure to give the complete introductory cautionary instruction is not plain error in light of the remaining instructions given to the jury.

¶ 55 Contrary to Appellant's argument, in closing instructions, prior to first stage deliberations, the trial court did give verbatim and in its entirety OUJI–CR (2d) 10–8A as Instruction No. 24:

You have been permitted to take notes during the testimony of this case. If you have done so you may refer to them during deliberations, and discuss the contents of your notes with other jurors. In your deliberations, give no more or no less weight to the views of a fellow juror just because that juror did or did not take notes. Your notes are not official transcripts, but are simply aids to your memo-

ry. It is the testimony from the witness stand which must be the basis of your determination of the facts, and ultimately, your verdict in the case.

¶ 56 Reviewing the instructions given to the jury in their entirety, they fairly and accurately stated the applicable law and appropriately and properly narrowed and directed the jury's discretion to use notes taken during trial. This proposition is denied.

### FIRST STAGE ISSUES

¶ 57 Appellant asserts in his third proposition of error that the trial court denied his rights under the Confrontation Clause of the Sixth Amendment by improperly limiting his ability to cross-examine Michael Frerene, Shawanda Rogers and Kevin Hopson about two prior domestic incidents between Frerene and Rogers. The record reflects the defense had evidence of two incidents, one in which Rogers stabbed Frerene and the other in which Frerene assaulted Rogers, which occurred in April 2000 and September 1999. The trial court ruled this evidence inadmissible. However, the defense sought to question Frerene, Rogers, and Hopson about the incidents for purposes of attacking the witnesses' credibility pursuant to 12 O.S.2001, § 2608.[8]

¶ 58 The Sixth Amendment guarantees a defendant the right to cross-examine witnesses; it also allows a trial judge to place reasonable limits on cross-examination. *Thrasher v. State*, 2006 OK CR 15, ¶ 7, 134 P.3d 846, 849 *citing Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Not all limitations on the cross-examination of a prosecution witness run afoul of the right of confrontation. *Id.* Trial judges have wide latitude to impose reasonable limits on such cross-examination based on concerns about "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repet-

8. 12 O.S.2001, § 2608(B)(1) provides:
B. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Section 2609 of this Code, may not be proved by extrinsic evidence. They may, however, in the discretion of the

court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness if they:
1. Concern his character for truthfulness or untruthfulness:
. . .

itive or only marginally relevant." *Id. quoting Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435. We generally review a trial judge's limitations on the extent of cross-examination for an abuse of discretion. *Id. See also Scott v. State,* 1995 OK CR 14, ¶ 28, 891 P.2d 1283, 1294.

¶ 59 On direct examination, Frerene was asked how Appellant affected his relationship with Rogers. Frerene testified he told Rogers he didn't like her "dating nobody else especially, ... with the kids involved and everything." He testified he and Rogers had "arguments about it" and one day when he came home from work she and the kids were gone.

¶ 60 On cross-examination, the following occurred:

Q [defense counsel]: And I believe on direct examination you talked to Ms. Carlson about everything, and correct me if I'm wrong, that everything seemed to be going okay until Mr. Mitchell came in the picture, correct?

A [Frerene]: Right.

Q [defense counsel]: Okay. So what you're saying is that you and Ms. Rogers hadn't any problems prior to Mr. Mitchell coming in the picture?

MS. CARLSON [prosecutor]: Your Honor, objection, that is a misstatement of the testimony.

¶ 61 Although commenting that the evidence was not a felony conviction or prior inconsistent statement, the trial court ultimately sustained the State's objection on the grounds of relevancy.

¶ 62 Relying on *Hawkins v. State,* 1986 OK CR 58, 717 P.2d 1156, Appellant now argues that based upon his information about the two prior domestic incidents he had reasonable cause to believe Frerene was not truthful when he represented that his relationship with Rogers was problem free prior to Rogers' affair with Appellant.

¶ 63 Initially, Appellant has mischaracterized Frerene's testimony on direct examination. Frerene never testified that everything was fine between himself and Rogers prior to Appellant entering the picture. He merely testified that he and Rogers argued over her

involvement with Appellant. Therefore, defense counsel's restatement of that testimony on cross-examination was inaccurate, beyond the scope of direct examination, and not an appropriate basis for questions to Frerene concerning any domestic altercations with Rogers.

¶ 64 In *Hawkins,* this Court upheld the State's cross-examination of the defendant concerning previous alcohol-related driving offenses. 1986 OK CR 58, ¶¶ 7–8, 717 P.2d at 1158–1159. The Court stated that while a conviction for driving under the influence is not one of the offenses which may be used for general impeachment purposes under 12 O.S. § 2609, the prior conviction could be used to show the untruthfulness of the defendant under 12 O.S. § 2608(B)(1) as the defendant was charged with a misdemeanor Driving Under the Influence and had testified that he could not drink any amount of liquor due to a health problem. This Court found that "[b]ased on the appellant's testimony on direct examination, the prosecutor had reasonable cause to believe the appellant was not truthful, since, at the time of his arrest on the instant charge, the appellant's driver's license was under suspension for failure to submit to a chemical test." *Id.*

¶ 65 The present case is distinguishable from *Hawkins* as the defendant's testimony in *Hawkins,* on both direct examination and cross-examination, was directly relevant and material to the charged offense and to his proffered defense. In Appellant's case, testimony that the biological father of the deceased had altercations with the deceased's mother several months before the deceased was fatally injured while in the care of the mother and Appellant is wholly immaterial to the issue of Frerene's truthfulness as a witness and collateral to any issue in the case.

■ ¶ 66 Despite Appellant's argument that his purpose in asking the witnesses about the prior domestic incidents was to attack their credibility, the record indicates another motive for the questions—to show the jury Roger's propensity for violence and ultimately show she was responsible for the deceased's fatal injuries. Defense counsel admitted such during her cross-examination

of Kevin Hopson. On direct examination, Hopson testified that he had no concerns for the safety of the children while they lived with Frerene and Rogers. On cross-examination, defense counsel asked whether Hopson had any concerns for the children's safety despite the fact Rogers had stabbed Frerene on a previous occasion. When the State objected on the grounds of relevancy, defense counsel argued the question was proper to show Rogers' propensity for violence and to challenge the impression that there was no violence in the children's lives.

¶ 67 Contrary to Appellant's argument, Hopson did not testify that there was not any violence in the children's lives prior to Rogers' involvement with Appellant. He testified that while the children lived with Rogers and Frerene he never saw any evidence that the children were beaten and had no concerns for their safety. His knowledge of any previous altercations between Rogers and Frerene was not probative of his truthfulness as a witness.

¶ 68 Testimony concerning Frerene's and Hopson's knowledge of the prior altercations, unrelated to the decedent's murder, did not concern those witnesses' character for truthfulness and therefore was not relevant to their credibility. The trial court did not abuse its discretion in limiting cross-examination into the prior altercations as that evidence was properly excluded under § 2608. *See Moore v. State,* 1987 OK CR 68, ¶¶ 21–23, 736 P.2d 161, 166 (evidence of violence and unlawful conduct by witness unrelated to offense on trial held inadmissible under § 2608 as not probative of witness's truthfulness).

¶ 69 In determining whether the Sixth Amendment has been violated, we look to see whether there was sufficient information presented to the jury to allow it to evaluate the witness and whether the excluded evidence was relevant. *Thrasher,* 2006 OK CR 15, ¶ 9, 134 P.3d at 849. By excluding the evidence of the prior altercations, the trial court did not prevent Appellant from challenging by other means the witnesses' credibility as being truthful witnesses and did not deny Appellant the ability to put on a defense. The evidence in this case showed the fatal inju-

ries were inflicted upon the deceased at a time when she was in the care of Appellant and Rogers. Neither Frerene nor Hopson were present at the time the deceased was fatally injured and neither could testify to the infliction of the fatal injuries. Any information they had about domestic altercations between Rogers and Frerene occurring three to eight months prior to the deceased's murder was not relevant in proving who, between Rogers and Appellant, was responsible for the deceased's death. Appellant thoroughly questioned Frerene and Hopson concerning Rogers' treatment and care of the children, whether she disciplined them and if so, what form that discipline took, and her prior inconsistent statements.

¶ 70 As for Rogers, during her cross-examination, defense counsel made a record that if allowed, she would inquire of Rogers about the two prior domestic incidents with Frerene, but because of the court's prior rulings, counsel said she was not going into that issue. Despite the trial court's limitation on the prior altercation evidence, Appellant was able to challenge Rogers' truthfulness as a witness in other ways. Appellant questioned Rogers extensively on inconsistent statements she had given prior to trial, on direct examination, and on cross-examination regarding her care for the children, Appellant's treatment of the children, and the events of July 23, 2000. Under defense counsel's questioning Rogers repeated her testimony from direct examination that she had been convicted of abusing Kyree and permitting the murder of Charita and was serving a life sentence.

¶ 71 A review of the record shows that sufficient information was presented to the jury to allow it to evaluate the truthfulness of Frerene, Hopson, and Rogers. The excluded evidence of the prior altercations between Frerene and Rogers was not relevant in determining who inflicted the fatal injuries on the decedent. Accordingly, we find no Sixth Amendment violation and that the trial court did not abuse its discretion in its limitation on cross-examination. This proposition of error is denied.

¶ 72 In his sixth proposition of error, Appellant contends that certain evi-

dence was improperly admitted as it was irrelevant, cumulative and prejudicial. The trial court's admission or exclusion of evidence over a timely objection or offer of proof is ordinarily discretionary and will not be reversed on appeal unless clearly erroneous or manifestly unreasonable. *Hancock v. State*, 2007 OK CR 9, ¶ 72, 155 P.3d 796, 813. Where Appellant fails to object contemporaneously to evidence when admitted, or make an offer of proof concerning excluded evidence, our review is limited to plain error. *Id.* We review Appellant's challenges to the trial court's rulings with these principles in mind.

¶ 73 Initially, Appellant complains about the admission of a single pre-mortem photograph of the decedent. Defense counsel objected to the photograph at trial arguing that its probative value was outweighed by its prejudicial effect. The trial court overruled the objection finding the photograph admissible under 12 O.S.Supp.2002, § 2403. Now on appeal, Appellant challenges the constitutionality of § 2403 and this Court's interpretation of the statute. Although recognizing this Court has previously rejected such arguments, Appellant asks us to reconsider or at least consider imposing stronger guidelines for the admission of pre-mortem victim photographs.

¶ 74 This Court has repeatedly upheld the constitutionality of § 2403 and specifically stated that the statute permits the admission of only one "appropriate" pre-death photograph of the victim, if the probative value of the photograph is not substantially outweighed by the danger of unfair prejudice and that § 2403 is constitutional. *Grant v. State*, 2009 OK CR 11, ¶ 52, 205 P.3d 1, 22; *Marquez–Burrola v. State*, 2007 OK CR 14, ¶¶ 28–33, 157 P.3d 749, 759–760; *Glossip v. State*, 2007 OK CR 12, ¶¶ 77–79, 157 P.3d 143, 156–157; *Coddington*, 2006 OK CR 34, ¶¶ 53–57, 142 P.3d at 452–53; *Hogan v. State*, 2006 OK CR 19, ¶ 64, 139 P.3d 907, 931. We find no reason to depart from that position here, nor do we find any reason to impose stronger guidelines for the admission of pre-mortem photographs.

¶ 75 The photograph admitted in the present case was an appropriate snapshot of the decedent offered to show her general appearance and condition while alive in accordance with § 2403. The probative value of the photograph was not substantially outweighed by the danger of unfair prejudice. Further, the prosecutor's display during first stage closing argument of the pre-mortem photograph and a post-mortem photograph, accompanied by the comment that on July 23, 2000, the decedent went from "this [indicating the pre-mortem photo] to this [indicating the post-mortem photo]" was not so prejudicial as to deny Appellant a fair trial in light of the great weight of the evidence against him.

¶ 76 Appellant next complains about testimony from Michael Frerene concerning the appearance of bite marks on the decedent's body. When asked to describe the injuries he saw to the decedent when he saw her at the hospital on July 23, Frerene testified, "[i]t looked like you would see like the flesh torn off of her buttocks and looked like she had like bite marks on her." Appellant objected to the testimony, arguing that Frerene was not an expert, was not qualified to identify bite marks, and that his testimony was an evidentiary harpoon. The trial court dismissed the claim of evidentiary harpoon, stated that anyone can tell what a bite mark is, and overruled the objection and the motion for mistrial.

¶ 77 The State never sought to qualify Frerene as a medical expert and specifically informed the jury he was not an expert and did not know how the decedent received her injuries. As a lay witness, Frerene could testify to his observations and opinions based on those observations. 12 O.S.2001, § 2701. Admission of this testimony was not error.

¶ 78 Appellant next finds error in the admission of testimony from Shawanda Rogers that she was afraid of Appellant. He argues that "whatever relevance it had", was substantially outweighed by the danger of unfair prejudice. Rogers' testimony was disjointed, inconsistent and at times incoherent. The judge repeatedly told her to sit up, not to mumble and to take her hand away from her face while she testified. He told her more than once to "wake up and answer the

questions and say yes or no", and "you need to sit up, open your eyes, pay attention and answer the question." The prosecutor informed the court that in pre-trial interviews, Rogers had been a cooperative witness and he was perplexed by her present inability to remember much of anything and apparent unwillingness to testify. Rogers denied being on any medications which would prevent her from testifying. In an attempt to ease her apparent discomfort, Rogers was given a blanket. She eventually told the court she had stayed up all night and was just sleepy.

¶ 79 When the proceedings resumed after a recess, Rogers indicated she had some coffee to drink, was awake, and ready to answer questions. After the recess, Rogers appeared more than willing to testify and her memory seemed to improve. The prosecutor attempted to question her about inconsistencies between her pre-trial statements to Detective Edwards and her testimony at trial. Rogers said she did not tell Edwards the truth because she was scared, she was young, she "didn't know the truth" and she was scared of Appellant "back then". Defense counsel objected, not on the grounds that Rogers said she was afraid of Appellant, but on grounds that her testimony after the recess was markedly different from that prior to the recess. After an *in-camera* hearing, the court found no improprieties had occurred, the objection was overruled and no further objections were raised.

¶ 80 The record reflects that Rogers did not turn out to be the witness the State had hoped for. Any prejudice in her expression of fear of Appellant was minimal in light of the numerous other reasons offered for not talking truthfully with Detective Edwards and as no other testimony or evidence supported the comment. When considered individually and collectively with other errors, the comment did not deny Appellant a fair trial.

■ ¶ 81 Appellant also complains about the admission of a letter he wrote to Rogers in 2002. Defense counsel objected to the letter on grounds it was too prejudicial. The letter was written two years after the decedent's death and received by Rogers after she had been sentenced for permitting child

abuse murder. Rogers testified it was the only communication she had with Appellant since she had been arrested. The letter is filled with racial epithets and intimate sexual references. It was offered to corroborate Rogers' testimony that Appellant never accused her of killing the decedent.

¶ 82 While Appellant's defense at trial was that Rogers was responsible for the decedent's fatal injuries, it is relevant that in their only communication after their arrest and while Appellant was behind bars for the decedent's murder, Appellant neither accused Rogers of the murder nor complained that she was setting him up for the murder. Any prejudicial effect from the personal references were not such as to deny Appellant a fair trial.

■ ¶ 83 Finally, Appellant complains that testimony from Drs. Gessouroun and Stuemky in the first stage and from Dr. Royal in the second stage was needlessly cumulative and only presented to put additional emphasis on the decedent's injuries rather than the identity of the perpetrator. The record reflects that Dr. Haynes testified concerning her observations of the decedent in the pediatric emergency room on July 23, 2000. She testified about efforts to aid the decedent and the extensiveness of the injuries. She expressed doubt that the decedent had been injured the day before July 23, 2000. Dr. Gofton, the Chief Medical Examiner for the State of Oklahoma, testified to the autopsy conducted on the decedent's body and to the decedent's injuries only to explain his opinion that the manner of death was homicide and the cause of death was head trauma. He did not testify to any symptoms the decedent might have suffered and his approximation of the time of injury was less specific than that of Dr. Haynes as he could only state that the injuries could not have happened before Saturday afternoon, July 22, 2000.

¶ 84 Dr. Gessouroun was the next medical expert to testify. Appellant's objection to his testimony as cumulative was overruled. Dr. Gessouroun testified to his observations of the decedent on July 24, 2000, in the pediatric intensive care unit. He testified to the

decedent's injuries as they explained his opinion that the onset of symptoms would have occurred immediately after infliction of the injuries and that the fatal injuries could not have been inflicted as early as Saturday night. Dr. Gessouroun testified that after infliction of the fatal injuries, the decedent would not have been able to play or fuss with her brother. He narrowed the time the fatal injuries were inflicted to as no earlier than approximately 8:20 a.m. Sunday morning, July 23. The trial court properly overruled defense counsel's objection as the testimony was not cumulative to any previous expert testimony and was relevant in determining that the fatal injuries were inflicted after Rogers had gone to work at 8:00 a.m.

¶ 85 Over defense counsel's objection, Dr. Stuemky testified next. He was not personally involved in the decedent's care but reviewed her medical records. As Chief of Pediatric Emergency Medicine and Medical Director of the Emergency Department at Children's Hospital, he testified that based upon his extensive experience in pediatric emergency care, the decedent would have become immediately symptomatic and her symptoms would have been such that a layman would have observed that she was not right. He testified that based upon his review of the records, the decedent received the fatal injuries the day she was seen in the emergency room, that she would not have been able to communicate upon receiving the injuries and possibly, would have become immediately unconscious. Dr. Stuemky's testimony was relatively brief and any repetition in his testimony with that of the other doctors was not so prejudicial as to deny Appellant a fair trial. The time the fatal injuries were inflicted and how the decedent would have appeared were central issues in both the State's prosecution and Appellant's defense.

¶ 86 In the second stage of trial, the decedent's suffering was relevant to the State's allegation of the "especially heinous, atrocious or cruel" aggravating circumstance. Dr. Royal saw the decedent in the pediatric intensive care unit once she passed out of the emergency room. He testified that the decedent's injuries would have been extremely painful and that she would have suffered from the blows to the head for a period of time not over ten minutes. He also testified that she would have suffered from many of the other injuries for some time, possibly even weeks, before she died. Defense counsel did not object to this testimony and we find no plain error in its admission.

¶ 87 When measuring the relevancy of evidence against its prejudicial effect, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value. *Mayes v. State*, 1994 OK CR 44, ¶ 77, 887 P.2d 1288, 1310. Although all of the first stage evidence was incorporated into the second stage, and while there was admittedly some overlap in the medical experts' testimony, we find Dr. Royal's testimony did not deny Appellant a fair sentencing stage. Dr. Royal's testimony did not suggest the jury decide the case on emotion or any other improper basis. Therefore, the trial court did not abuse its discretion in admitting the testimony.

¶ 88 Having thoroughly reviewed Appellant's challenges to the evidence, we find the evidence properly admitted. Therefore, we reject Appellant's argument that the cumulative effect of the evidence denied him a fair trial. Finding no error warranting reversal of Appellant's convictions or modification of his sentences, this proposition of error is denied.

¶ 89 In his ninth proposition of error, Appellant contends the evidence was insufficient to support the conviction in Count III, Child Abuse of Kyree Rogers. Appellant argues that it was not clear from the evidence that he caused the victim's injuries or that the injuries amounted to child abuse. This same argument was raised and rejected in Appellant's first appeal. There we noted that at the time of the crime, Title 10, Section 7115 provided, in pertinent part:

Any parent or other person who shall willfully or maliciously engage in child abuse . . . or who shall otherwise willfully or maliciously injure, torture, maim, use unreasonable force upon a child under the age of eighteen (18) . . . shall upon conviction be guilty of a felony. . . .

10 O.S.Supp.1999, § 7115 The plain language of the statute does not require life-threatening or even serious injury The extent of force necessary for a conviction under § 7115 is limited by 21 O.S.2001, § 844, which allows a parent or other person to use ordinary force as a means of discipline and which contemplates the use of instruments in such discipline However, even though § 7115 is limited by, and would not apply to, those situations involving ordinary force, nothing in either statute suggests a certain level of injury is necessary before applied force can be considered unreasonable.

2005 OK CR 15, ¶ 60, 120 P.3d at 1211.

¶ 90 Further, we noted that although we have seen injuries more severe than those suffered by Kyree, "we have never required 'more than bruising' for a conviction to be sustained" citing *Johnson v. State*, 1988 OK CR 54, ¶ 7, 751 P.2d 1094, 1096. *Id.*, 2005 OK CR 15, ¶ 61, 120 P.3d at 1211–1212. We stated that "[w]hile some people may disagree on what 'unreasonable force' means in the context of child punishment, *Johnson* shows the distinction between bruises caused by ordinary force and those caused by unreasonable force must be determined from all the facts surrounding the conduct under investigation." *Id.*

¶ 91 The evidence presented in the re-trial appears to be the same as that presented in the first trial. Dr. Casax testified she examined Kyree and found a high number of large, patterned bruises on the truncal portion of his body, each side of his buttocks, and onto his thighs and shoulders. Many of the bruises had a distinctive "loop" shape. She said Kyree was bruised in areas not consistent with accidental trauma and she thought the looped pattern of the bruises was consistent with cord injury and with abuse. She testified the bruises were "less than" a month old and were not life threatening.

¶ 92 Kyree did not testify at the re-trial but his testimony from the first trial was read for the jury. Kyree stated that Appellant hit him with a belt and the "hard part" of a fly-swatter and that he cried when Appellant hit him. He testified that on the day Charita died, Appellant "whipped" both of them. He did not remember his mother spanking him at all.

¶ 93 Several items found at Appellant's residence could have made looped pattern injuries—a metal fly-swatter, hanger, and electrical cord. Appellant admitted he spanked Kyree with his hand, but said he never struck him with the belt, hanger, fly-swatter or cord.

¶ 94 Where there is competent evidence from which a jury could reasonably conclude the defendant was guilty of the crime charged, this Court will not interfere with the verdict, even though there may be conflicts in the evidence from which different inferences may be drawn. *Mitchell*, 2005 OK CR 15, ¶ 63, 120 P.3d at 1212. Even though Kyree's bruises were not severe, a rational jury could conclude from the evidence that his bruises were not the result of ordinary force or a lawful spanking and that they were inflicted by Appellant. This proposition of error is denied.

### FIRST STAGE JURY INSTRUCTIONS

¶ 95 In his tenth proposition of error, Appellant contends the trial court erred in instructing the jury on the elements of First Degree Child Abuse Murder. Specifically, he contends the definition of "unreasonable force" contained in Instruction No. 5 was inaccurate, misleading, incomplete, and "perverts the meaning of unreasonable force to mean any force not ordinarily used to discipline a child." (Appellant's brief, pg. 60).

¶ 96 Instruction No. 5 is the uniform instruction setting out definitions for terms used in crimes against children. *See* OUJI–CR (2d) 4–40D. "Unreasonable force" is defined as "[m]ore than that ordinarily used as a means of discipline". This definition was taken from 21 O.S.2001, § 844.[9] We review

---

9. Title 21 O.S.2001, § 844 provides:
Provided, however, that nothing contained in this act [Oklahoma Children's Code] shall prohibit any parent, teacher or other person from using ordinary force as a means of discipline, including but not limited to spanking, switching or paddling.

the trial court's decision to give this instruction for plain error only as Appellant neither objected to the instruction or offered a substitute instruction to correct any possible deficiencies in the instruction.

¶ 97 In *Abshier v. State*, 2001 OK CR 13, 28 P.3d 579, *overruled in part on other grounds, Jones v. State*, 2006 OK CR 17, ¶ 12, 134 P.3d 150, 155, n. 14, we rejected a claim similar to the one brought in the instant appeal. In *Abshier*, we stated in part:

Appellant makes the strange statement: "The instruction in Appellant's case went even further, allowing a conviction for use of force that was reasonable but not ordinarily used to discipline a child." Appellant omits two key words: "more than." If the force used on a child is *more than* that ordinarily used as a means of discipline, it would be unreasonable.

2001 OK CR 13, ¶ 187, 28 P.3d at 615.

¶ 98 Appellant acknowledges *Abshier* but seeks our reconsideration of the issue by continuing the argument that under § 844, force that is not ordinarily used to discipline a child, such as the use of a belt or fly-swatter, may nevertheless be considered reasonable/ordinary force. He further finds the failure of the instruction in this case to inform the jury that ordinary force includes "spanking, switching, or paddling" was especially prejudicial in light of evidence which showed he merely spanked Kyree with a belt and fly-swatter.

¶ 99 Appellant's arguments do not persuade us to reconsider *Abshier*. Whether the means of imposing discipline on the child is spanking, switching, or paddling as set out in § 844 or "whipping" as testified to in this case, the gravamen of § 844 is the degree of force with which that discipline is imposed. If it is more than that ordinarily used as a means of discipline, it would be unreasonable. Whether or not it was more than that ordinarily used as a means of discipline is a question for the jury based on the evidence before them. In the present case, as in *Abshier*, the degree of force used by Appellant on Kyree cannot be construed as reasonable under any standard. We find no plain error in giving Instruction No. 5. This proposition of error is denied.

¶ 100 In his twelfth proposition of error, Appellant contends the trial court erred in failing to instruct the jury that Shirley Martin's prior inconsistent statements could be used as substantive evidence for determining guilt or innocence. As Instruction No. 18, the jury was given the first portion of the uniform instruction on prior inconsistent statements which provided:

Evidence has been presented that on some prior occasion a witness or witnesses made a statement or statements inconsistent with their testimony in this case.

This evidence is called impeachment evidence and it is offered to show that the witness's testimony is not believable or truthful. If you find that a statement was made ... you may consider this impeachment evidence in determining what weight and credit to give the testimony of that witness. You may not consider this impeachment evidence as proof of innocence or guilt. You may consider this impeachment evidence only to the extent that you determine it affects the believability of the witness, if at all.

(OUJI–CR 2d 9–20).

¶ 101 The jury was not given the second paragraph of the uniform instruction which provides:

However, if you find the statements of the witness were made [Specify When, Where, and To Whom the Statements Were Made], the statements may also be considered as proof of innocence or guilt.

¶ 102 Appellant asserts this omission impaired his ability to prove his theory that Rogers inflicted the fatal injuries by showing that the decedent exhibited physical signs of distress soon after Rogers arrived for work at 8:00 a.m. on July 23, 2000, and that earlier in the day the decedent's physical problems manifested, the more the medical evidence pointed to Rogers as the source of the abuse. Appellant raised no objection to Instruction No. 18, therefore we review only for plain error.

¶ 103 On direct examination, Martin testified that Appellant called the Fifth Seasons Hotel asking for Rogers three times between

8:00 a.m. and 9:00 a.m. She also testified that Appellant called at 10:30 a.m., and for the first time said that the decedent was having a seizure. On cross-examination, defense counsel read from Martin's testimony at Rogers' 2002 trial and asked if she had testified at the prior trial that the first call referencing a seizure was made at approximately 9:00 or 9:30 a.m. Martin replied, that she "probably" testified that way, that she wasn't sure, "but that ain't what happened." When asked again on re-cross examination if her prior testimony indicated the first call about the seizure was between 9:00 and 9:30 a.m., Martin replied, "No, I don't agree. I don't know. I don't remember."

¶ 104 We find no plain error in the trial court's failure to instruct the jury that Martin's prior testimony should be considered as substantive evidence of guilt or innocence. Looking first at the instructions given to the jury, they were instructed that evidence included testimony of witnesses, that they were to base their verdict on the evidence, and that they had been given all the evidence which was proper for them to consider. The jury was not precluded in any way from considering all of Martin's testimony in determining guilt or innocence. None of Martin's testimony was singled out in the instructions for any special consideration, nor should it have been. It is not at all clear from the record whether Martin admitted making any prior inconsistent statements. Further, in closing arguments, Martin was merely one of several witnesses whose testimony was relied upon by Appellant in arguing that Rogers had committed the fatal injuries before she left for work so that when Appellant called her at work, Rogers felt no need to rush home and check on the decedent's condition. As the jury was not precluded from fully considering evidence presented in Appellant's defense, we find no plain error in the court's instruction to the jury. This proposition of error is denied.

### SECOND STAGE ISSUES

¶ 105 In Proposition One, Appellant contends the trial court abused its discretion in refusing to accept the "plea/sentencing agreement" reached by the State and the defense, thus forcing him to face the death penalty. Therefore, Appellant asserts that in the interests of justice his death sentence should be modified to life in prison without the possibility of parole.

¶ 106 The record reflects that approximately three hours after the jury returned a guilty verdict in each count, the parties appeared before the trial judge and indicated an agreement had been reached wherein the State would dismiss the Bill of Particulars and recommend a sentence of life without the possibility of parole in Count I (first degree murder) and life with the possibility of parole in Count III (child abuse), both sentences to run consecutively, in exchange for Appellant pleading guilty and waiving his rights to jury sentencing and to appeal his convictions and sentences. The trial judge then inquired of Appellant, asking if he was taking any medications which affected his ability to understand the proceedings, whether he had been prescribed any medication which he should have been taking but was not, whether he was under the care of a health care professional, whether he understood the nature and consequences of the proceeding and the ramifications of entering a plea of guilty, whether he understood the charges filed against him, and whether he understood his rights and what rights he was giving up by pleading guilty. Appellant responded that he was not taking any medications which affected his ability to understand the proceedings and that he was not being treated for any mental illness. Appellant indicated he understood the nature and consequences of the proceeding and the criminal charges filed against him. Upon being informed of the statutory range of punishment and his constitutional rights, Appellant indicated he wished to change his plea from not guilty to guilty. When asked if he committed the acts charged in the Information, Appellant replied, "I didn't do that. I didn't do that. I didn't do it." Thereafter, the trial judge refused to accept the parties' agreement and informed them that the punishment phase of trial would commence at 9:00 a.m., the next morning.

¶ 107 Now on appeal, Appellant argues that once the prosecution agreed to dismiss the Bill of Particulars in exchange for his

agreement to change his plea of guilty and waive his appeals, the trial court was obliged, under the legal principles governing guilty pleas, to accept his knowing, voluntary, and factually supported plea and either sentence him according to the agreement or otherwise choose a sentencing option other than death. Appellant asserts that in light of his claim of innocence, the trial court should have accepted his plea under the procedures set forth in *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) with the jury's verdict providing the factual basis for the plea.[10]

¶ 108 Despite his reliance on the principles of law relating to guilty pleas, Appellant further asserts his claims of innocence were no reason for the trial court to reject the agreement as this was not a typical guilty plea but was actually only a sentencing agreement entered into after the guilt phase of trial. Appellant requests this Court adopt procedures and forms similar to those in *King v. State*, 1976 OK CR 103, 553 P.2d 529 and Form 13.10, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2010) to be used in cases where, after a jury has returned a verdict of guilt on one or more capital charges, the State and the defense reach an agreement on a sentence less than death in exchange for a defendant giving up his appeal rights.

¶ 109 In its response, the State asserts it is within the trial court's discretion to reject a plea of guilty upon assertions of innocence. The State contends that under the facts in this case, the trial court did not abuse its discretion in arresting the plea proceedings and commencing the punishment phase of trial in light of Appellant's repudiation of the agreement by reasserting his innocence.

¶ 110 This case presents us with a conundrum. Both the prosecutor and defense counsel acknowledged that a sentencing agreement had been reached, yet they announced Appellant intended to plead guilty, after the jury had already returned a guilty verdict. Under basic legal principles, once the jury's verdict of guilt is returned and accepted by the trial court, we are no longer dealing with a plea of guilty, entered in order to avoid trial, but rather with punishment for the crime of which the defendant has just been convicted. Appellant's protestations of innocence do not turn the proceedings into an *Alford* plea, as the "plea" was offered after the jury's return of a guilty verdict. When the jury's verdicts of guilt as to first degree murder and child abuse had been returned and accepted by the court, any subsequent proceedings were not guilty pleas which required the judge's acquiescence, but attempted waivers of Appellant's statutory rights to jury sentencing and a direct appeal.[11]

¶ 111 Viewing this as a sentencing agreement, the terms were that Appellant would waive his right to jury sentencing and his right to appeal in exchange for the State dismissing the Bill of Particulars and thus removing the death penalty as a sentencing option. However, the announcement by the parties that Appellant wanted to plead guilty misdirected the trial court's attention toward the principles governing guilty pleas (*King v. State*, 1976 OK CR 103, 553 P.2d 529; *Ocampo v. State*, 1989 OK CR 38, 778 P.2d 920) rather than those governing waivers of the right to jury sentencing (21 O.S.2001, § 701.10)[12] and the right to appeal (22 O.S. 2001, § 1051; *Grasso v. State*, 1993 OK CR 33, 857 P.2d 802).[13]

¶ 112 Waivers of the rights to jury sentencing and to appeal must be knowing and voluntary. 21 O.S.2001, § 701.10; *Grasso*, 1993 OK CR 33, ¶ 12, 857 P.2d at 806. In the

---

10. In *Alford*, the Supreme Court held that a defendant's protestations of innocence do not undermine an otherwise valid guilty plea.

11. We therefore reject Appellant's request to adopt procedures and forms similar to those used in guilty plea situations for situations where the defendant seeks to waive jury sentencing under § 701.10 for a sentence less than death in exchange for a giving up his appeal rights.

12. *Compare* 22 O.S.2001, § 926.1, which requires a defendant to affirmatively request jury sentencing.

13. The right to appeal under 22 O.S.2001, § 1051 is distinct from this Court's mandatory sentence review under 21 O.S.2001, § 701.13 which is not subject to waiver. *Grasso*, 1993 OK CR 33, ¶ 21, 857 P.2d at 807.

present case, the development of a record sufficient for us to find a knowing and voluntary waiver of the right to jury sentencing and the right to an appeal was cut short by the trial court's abrupt halt to the proceedings upon Appellant's claim of innocence. Instead of stopping the proceedings, the trial judge should have inquired further to ensure that Appellant understood he could maintain his claim of innocence and at the same time agree to the State's sentencing offer which included waivers of the rights to jury sentencing and to appeal.

¶ 113 At that critical juncture in the proceedings, the issue was whether Appellant had been fully informed of his right to jury sentencing and the right to appeal, whether he understood those rights, whether he understood he could waive one or both of those rights and the effects of such a waiver on those rights, and whether he was voluntarily waiving any of those rights. When the record shows that under this type of inquiry, the defendant fully understands both the nature of the right and the legal effect of the waiver of that right, a knowing and voluntary waiver can be found, and this Court would honor such a waiver. Regrettably, we have no such record in this case.

¶ 114 The trial court has a duty regarding a potential waiver of rights to act in a protective role to ensure that any waiver is knowingly and voluntarily made with a full understanding of the relevant circumstances. The trial judge in this case was extremely proficient and experienced, yet when confronted with the parties' contradictory statements, turned to the more commonly used procedure for accepting guilty pleas.[14] However, the needless insistence that Appellant confess his guilt as if he were entering a guilty plea, and the trial court's immediate halt to the proceedings upon Appellant's assertion of innocence, leaves us with at best an equivocal expression of Appellant's desire to waive his rights to jury sentencing and to appeal.

¶ 115 As a result of the trial court's hasty rejection of the sentencing agreement, Appellant has now received the benefit of a direct appeal. However, the trial judge's erroneous assumptions about the proceedings before him should not result in the imposition of a death sentence which the State had agreed to abandon before the sentencing phase of trial. The law should not require a defendant to defend himself at trial against a death sentence which the State no longer seeks. Therefore, we find Appellant's death sentence should be modified to life in prison without the possibility of parole. Appellant's sentences are to run consecutively, per the parties' sentencing agreement.

¶ 116 The modification of Appellant's death sentence renders moot Propositions of Error 14-15, relating to imposition of the death penalty, and our mandatory sentence review under 21 O.S.2001, § 701.13(C).

### SECOND STAGE JURY INSTRUCTIONS

¶ 117 In his eighth proposition of error, Appellant argues the trial court erred in allowing the jury to consider punishment for both the capital murder and the non-capital offense of child abuse during the second stage of his bifurcated trial. Appellant asserts he was denied a fair sentencing hearing on the child abuse conviction and the life sentence imposed in that count should be vacated and remanded for resentencing. We review Appellant's argument for plain error only as defense counsel raised no objection to the bifurcation procedures used by the trial court. *Wood v. State*, 2007 OK CR 17, ¶ 10, 158 P.3d 467, 473.

¶ 118 The record shows Appellant was alleged to have two prior felony convictions which were used to enhance his sentence for child abuse. One of these prior felonies, robbery with a firearm, involved the use of or threat of use of violence which was used to support the aggravating circumstance of prior violent felony.

¶ 119 As Appellant points out, *Perryman v. State*, 1999 OK CR 39, ¶ 14, 990 P.2d 900, 905, sets forth the procedure to be used when a defendant is charged with both capital murder and non-capital felonies for which

---

14. We commend Judge Black's attempt to preserve Appellant's appeal rights. We fully recognize that trial judges often do not have the time and support staff afforded this Court to research and analyze issues.

the State does not seek to enhance punishment by proof of prior conviction(s). In *Williams v. State*, 2001 OK CR 9, ¶ 42, 22 P.3d 702, 715, we held that *Perryman* is not controlling when the State seeks to enhance the defendant's non-capital felonies and those non-capital felonies are tried together with a charge of capital murder. In that case, we held that the bifurcated procedure used was not prohibited by statute and that any potential prejudice was eliminated by the instruction directing the jury not to consider victim impact evidence or any other evidence in support of the aggravating circumstances in assessing the sentence for the non-capital offense. *Id.*

¶ 120 Appellant now argues that his case "falls somewhere between *Perryman* and *Williams*" as it involves enhanced charges but the jury did not receive an appropriate limiting instruction. (Appellant's brief, pg. 52). Appellant contends that without the specific limiting instruction, and in light of the evidence presented to support the aggravating circumstances, it cannot be said beyond a reasonable doubt that his jury was not influenced in its sentencing decision on the child abuse count by the evidence of aggravation and victim impact.

¶ 121 The second stage instructions in this case began by instructing the jury on the punishment options for Appellant's conviction for Child Abuse. The jury was informed that the State had charged Appellant with having two prior felony convictions, that the law presumed Appellant had not been previously convicted as alleged by the State, and that they could consider the prior convictions only if the State proved beyond a reasonable doubt the fact of the convictions and that the defendant was the same person as that convicted. The ranges of punishment were then set forth based upon whether the jury found the existence of two prior convictions, one prior conviction or no prior convictions. The jury was not specifically instructed as in *Williams* not to consider the victim impact evidence or evidence supporting the aggravating circumstances in determining the sentence for the child abuse conviction.

¶ 122 The remaining instructions given to the jury were the uniform death penalty instructions. These instructions discussed the jury's consideration of aggravating circumstances exclusively in relation to its decision concerning the death penalty and the punishment for first degree murder. In his attempt to place a confusing interpretation on these instructions, Appellant directs us to Instruction No. 9. This is the uniform instruction on victim impact evidence which defines victim impact evidence and directs the jury as to its use as it specifically relates to the death penalty and to "other sentencing options". *See* OUJI–CR (2d) 9–45. Appellant asserts this could reasonably be interpreted as a direction to consider the victim impact evidence when determining punishment for the non-capital child abuse conviction.

¶ 123 Appellant's argument is not persuasive. Instruction No. 9 clearly referred to the use of victim impact evidence only as it related to punishment for first degree murder. The instruction was the seventh of thirteen instructions addressing punishment options for first degree murder. The "other sentencing options" mentioned in the instruction refer to the other available punishment options of life in prison with the possibility of parole and life in prison without the possibility of parole.

¶ 124 Reading the instructions in context and in their entirety, it is clear that only the first instruction addresses the sentencing options for the non-capital child abuse conviction while the remainder of the instructions concern the sentencing options for capital murder. The jury would have understood the sentencing procedures for the non-capital child abuse conviction were distinct from the sentencing procedures for capital murder conviction. It is well established that juries are presumed to follow their instructions. *Williams*, 2001 OK CR 9, ¶ 43, 22 P.3d at 716.

¶ 125 The fact that the jury imposed the maximum sentence of life imprisonment for Appellant's non-capital felony in this case is not proof that the jury was unfairly prejudiced by evidence offered to support the aggravating circumstances. Appellant's conviction for child abuse is deserving of a

lengthy sentence and that sentence is fully supported by the evidence. Therefore, Appellant has not shown that the jury recommended a harsher punishment for his non-capital felony as a result of the evidence admitted in second stage given the instructions and evidence in this case. This claim is denied.

¶ 126 In his sixteenth proposition of error, Appellant contends the trial court erred in its response to jury questions concerning the sentence of life without the possibility of parole and compounded the error by failing to comply with 22 O.S.2001, § 894 requiring the court to call the jury into the courtroom to answer any questions. As a sentence of life without the possibility of parole was a punishment option only for the first degree murder charge, and in light of our modification of Appellant's death sentence, we address only the second portion of the claim of error.

¶ 127 The record reflects that during deliberations, the jury sent out a note which read:

Is a sentence of life without parole 45 years or until he is deceased?

Can he get out of prison after 45 years if he is still alive?

(Jury Question # 1)

¶ 128 In consultation with the parties, the court placed a number 1 beside the first question and a number 1 in the place provided for the answer and wrote "no." Below that, the court wrote, "please review Instructions."

¶ 129 The record indicates all parties agreed on the first response without discussion. As for the second response, defense counsel informed the court that *Littlejohn v. State*, 2004 OK CR 6, 85 P.3d 287 set forth three options for a court's response to a jury's question. Defense counsel requested the third option be given. The trial court found the third option contained information which the jury could not be told and determined that referring the jury to the instructions was the best response.

¶ 130 In discussing the court's response, defense counsel never objected to the court responding by note rather than

bringing the jury into the courtroom and responding verbally. Under 22 O.S.2001, § 894, if the jury has a question during deliberations, the trial court is required to call the jury back into the courtroom in the presence of, or after notice to, the district attorney and defense counsel. "When a communication between a judge and jury occurs, after the jury has retired for deliberation, a presumption of prejudice arises." *Givens v. State*, 1985 OK CR 104, ¶ 19, 705 P.2d 1139, 1142. "That presumption may be overcome if, on appeal, this Court is convinced that, on the face of the record, no prejudice to the defendant occurred." *Id. See also Douglas v. State*, 1997 OK CR 79, ¶ 106, 951 P.2d 651, 679, *reversed on other grounds, Douglas v. Workman*, 560 F.3d 1156 (10th Cir., 2009); *Fisher v. State*, 1987 OK CR 85, ¶ 6, 736 P.2d 1003, 1007. As evidenced by our discussion below, we find Appellant was not prejudiced by the court's failure to strictly adhere to § 894 as the court's written response accomplished the same result as if the court had brought the jury into the courtroom and responded verbally.

¶ 131 In *Littlejohn*, 2004 OK CR 6, ¶ 11, 85 P.3d at 293–294, this Court said that when the jury during deliberations asks whether an offender who is sentenced to life imprisonment without the possibility of parole is parole eligible, the trial court should either 1) refer the jury back to the instructions, 2) tell the jury that the punishment options are self explanatory, or 3) advise the jury that the punishment options are to be understood in their plain and literal sense and that the defendant will not be eligible for parole if sentenced to life imprisonment without the possibility of parole. *Id.* The Court further noted:

While arguably the latter response is nothing more than another way of referring the jury back to the instructions, it does force the jury to accept the plain meaning of the sentencing options and impose the sentence it deems appropriate under the law and facts of the case. We recognize trial courts are in the best position to decide which answer is best suited to the situation

as the questions posed by juries come in a myriad of forms on this issue.

*Id.*

¶ 132 Looking at the jury's questions and the court's response in the present case, the court's response was not nearly as confusing as Appellant makes it out to be. The "no" answer accompanied by the number 1 very clearly responded to the first question-whether a sentence of life without parole is 45 years or until the defendant dies. The "please review instructions" response just as clearly is directed to the second question asked by the jury. In their written instructions, the jury was informed on the sentencing options of death, life imprisonment without the possibility of parole, life imprisonment with the possibility of parole, that with a sentence of life imprisonment, the defendant must serve eight-five percent (85%) of the sentence imposed before becoming eligible for consideration for parole, and the calculation of eligibility of parole is based upon a term of forty-five (45) years, so that a person would be eligible for consideration for parole after thirty-eight (38) years and three (3) months. The court's response fully complied with the requirements of *Littlejohn.* Any presumption of prejudice is overcome, however, as we are convinced that on the face of the record no prejudice to Appellant occurred. This proposition is denied.

## ISSUES RELEVANT TO BOTH STAGES OF TRIAL ALLEGATIONS OF PROS-ECUTORIAL MISCONDUCT

¶ 133 Appellant claims in his thirteenth proposition of error that instances of prosecutorial misconduct denied him a fair trial and reliable sentencing proceeding. It is well established that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Ryder v. State,* 2004 OK CR 2, ¶ 82, 83 P.3d 856, 875, *quoting United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1, 11 (1985). In order for the remarks of the prosecuting attorney to constitute reversible

error they must be flagrant and of such a nature as to be prejudicial to the defendant. *Id.* From a practical standpoint, every slight excess by the prosecutor does not require that a verdict be overturned and that a new trial be ordered. *Id.*

¶ 134 Appellant raises only one complaint regarding first stage, that during closing argument, the prosecutor improperly commented that in the letter Appellant wrote to Rogers, Appellant did not ask why he had been arrested nor did he ask why Rogers had blamed him for something she did "because he knows that he's not arrested for something that she did." Appellant argues the comment shifted the burden of proof and "imposed an onerous standard upon Appellant of proving his innocence by relinquishing his right to silence." (Appellant's brief, pg. 72). No objection was raised to the comment; therefore we review only for plain error and find none.

¶ 135 While not the most artfully phrased, the comment was a reasonable inference on what Appellant meant in his only communication with his co-defendant subsequent to their arrest for the murder of the decedent. The comment did not imply that Appellant had any burden to prove his innocence and did not override the jury's instructions on the presumption of innocence and burden of proof. The comment was not an impermissible reference to Appellant's right to remain silent. Before a purported comment at trial on the defendant's failure to deny his guilt will constitute error, the comment must directly call attention to that fact. *Mahorney v. State,* 1983 OK CR 71, ¶ 12, 664 P.2d 1042, 1046. An implication apparent only to defense counsel is not reversible error. *Id.* We find no plain error in the prosecutor's comment.

¶ 136 Appellant directs us to several instances of alleged misconduct during the second stage of trial. First, he complains that the prosecutor "consistently bickered and argued" with defense expert witnesses, Drs. Russell and Musick, and degraded mitigation evidence with sarcastic sidebar comments. (Appellant's brief, pg. 72). The testimony of these two witnesses was offered to mitigate

imposition of the death penalty pursuant to 22 O.S.2001, §§ 970–973. *See Malone v. State,* 2002 OK CR 34, ¶¶ 6–7, 58 P.3d 208, 209–210 (mitigation evidence under §§ 970–973 restricted to capital cases). *See also* Oklahoma Uniform Jury Instructions–Criminal (2d) 4–78. As Appellant's death sentence has been modified, any claim of error regarding these mitigation witnesses is moot.

¶ 137 Appellant further argues the prosecutor improperly appealed for sympathy for the victims and explicitly and improperly expressed his personal opinion when recommending the death penalty, and that the prosecutor denigrated his mitigation evidence and misstated the law relevant to the death penalty. In light of the modification of Appellant's death sentence, these claims of error are also moot.

¶ 138 Having thoroughly reviewed the alleged instances of misconduct in the first stage of trial, we find none so egregious as to deny Appellant a fair guilt stage trial. Further, reviewing all of the alleged second stage instances of misconduct as they relate to the jury's return of a life sentence for the child abuse conviction, we find no misconduct which denied Appellant a fair sentencing trial on the child abuse counts. This proposition is denied.

### ALLEGATION OF INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 139 Appellant contends in his seventeenth proposition of error that he was denied the effective assistance of counsel in both stages of trial. The standard of review for claims of ineffective assistance of counsel is that set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Ryder,* 2004 OK CR 2, ¶¶ 84–85, 83 P.3d at 875–876. *Strickland* applies the presumption that trial counsel was competent to provide the guiding hand that the accused needed, and therefore the burden is on the accused to demonstrate both a deficient performance and resulting prejudice. *Id. See also Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

¶ 140 *Strickland* sets forth the two-part test which must be applied to determine whether a defendant has been denied effective assistance of counsel. First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense. *Ryder,* 2004 OK CR 2, ¶¶ 84–85, 83 P.3d at 875–876. Unless the defendant makes both showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id. quoting Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. *Id.* The burden rests with Appellant to show that there is a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* This Court has stated the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance. *Id.*

¶ 141 Referring us to Proposition Two of his appellate brief, Appellant first argues counsel was ineffective for failing to object to comments made during *voir dire* by the trial court that he was presumed not guilty and attempts by the court and the prosecutor to define reasonable doubt. Appellant asserts that failure to object to prejudicial remarks which may serve as the basis for reversal or modification of sentence cannot be considered viable trial strategy.

¶ 142 As addressed in Proposition Two, herein, the comments by the trial court and prosecutor did not undermine Appellant's presumption of innocence or diminish the State's burden of proof beyond a reasonable doubt. Therefore, Appellant has not shown that counsel's performance was constitutionally deficient for failing to object to the comments or that he was prejudiced thereby.

¶ 143 Appellant next alleges counsel was ineffective for failing to request proper instructions and object to improper instruc-

tions in reference to his tenth, eleventh and twelfth propositions of error. Appellant argues that when a basis for objecting exists and counsel fails to make the objection, if the error goes to the heart of the case, that failure cannot be considered strategy.

¶ 144 In Proposition Ten, herein, we found that Instruction No. 5 properly instructed the jury on the definition of "unreasonable force". In Proposition Eleven, we found the court's instructions properly narrowed and directed the jury's discretion to use notes taken during trial. Counsel's failure to object in these two instances does not satisfy the requirements of *Strickland* because any such objections would have been properly overruled. *Cruse v. State*, 2003 OK CR 8, ¶ 11, 67 P.3d 920, 923.

¶ 145 In Proposition Twelve, we found that despite the trial court's failure to give the entire uniform instruction on prior inconsistent statements, the jury was not precluded in any way from considering all of Shirley Martin's testimony in determining Appellant's guilt or innocence. Therefore, Appellant has failed to show how he was prejudiced by counsel's failure to object.

¶ 146 Appellant next directs us to Proposition Seven and counsel's failure to object to the joinder of the charges of child abuse and child abuse murder in a single trial and the failure to request a severance of the two counts, and Proposition Eight and counsel's failure to object to the jury hearing evidence in support of the death sentence before imposing sentence for the child abuse conviction.

¶ 147 As discussed in Proposition Seven, the two counts were properly joined for a single trial. As any objection by counsel or request for severance would have been denied, Appellant has failed to show that counsel's performance was deficient or that he was prejudiced thereby. *Cruse*, 2003 OK CR 8, ¶ 11, 67 P.3d at 923.

¶ 148 In Proposition Eight, we found no error in allowing the jury to consider punishment for both the capital murder and the non-capital offense of child abuse during the second stage of the bifurcated trial. The instructions clearly informed the jury that sentencing procedures for the non-capital child abuse conviction were distinct from the sentencing procedures for the capital murder conviction. Any objection by counsel would have been overruled and Appellant has failed to meet his burden of showing counsel's ineffectiveness.

¶ 149 Finally, Appellant complains that counsel was ineffective in failing to object to the instances of prosecutorial misconduct raised in Proposition Thirteen. After thoroughly reviewing all the alleged misconduct, we found no statements so egregious as to deny Appellant a fair trial. Appellant has failed to show he was prejudiced by counsel's failure to object.

¶ 150 Having reviewed the allegations of ineffectiveness raised by Appellant, and considering counsel's challenged conduct on the facts of the case as viewed at the time of trial, we find Appellant has failed to meet his burden of showing a reasonable probability that, but for any unprofessional errors by counsel, the result of the trial would have been different as any errors or omissions by counsel did not influence the jury's determination of guilt or decision to impose the death sentence. Accordingly, we find that Appellant was not denied effective assistance of counsel and this assignment of error is denied.

### ACCUMULATION OF ERROR CLAIM

¶ 151 In his nineteenth proposition of error, Appellant contends that, even if no individual error merits reversal, the cumulative effect of such errors warrants either reversal of his conviction or a modification of his sentence. A cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Warner*, 2006 OK CR 40, ¶ 223, 144 P.3d at 896. However, when there have been numerous irregularities during the course of a trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors is to deny the defendant a fair trial. *Id.*

¶ 152 While certain errors did occur in the first stage of this case, even considered together, they were not so egregious or numer-

ous as to have denied Appellant a fair trial on the issue of guilt. As for second stage, we have found the trial court's failure to thoroughly advise Appellant of his rights to jury sentencing and to appeal, and the accompanying waiver of such rights, warranted modification of his death sentence for first degree murder to life imprisonment without the possibility of parole. Upon further review, we find no second stage errors warranting modification of Appellant's life sentence for child abuse. This assignment of error is denied.

### DECISION

¶ 153 The **JUDGMENTS** for First Degree Murder and Child Abuse are **AFFIRMED.** The **DEATH SENTENCE** for First Degree Murder is **MODIFIED TO LIFE IN PRISON WITHOUT THE POSSIBILITY OF PAROLE.** The **LIFE SENTENCE** for Child Abuse is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2011), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

A. JOHNSON, P.J., LEWIS, V.P.J., and SMITH, J.: concur.

C. JOHNSON, J.: specially concur.

C. JOHNSON, Vice–Presiding Judge, Specially Concur.

¶ 1 I specially concur in the well written analysis of Proposition One of the majority opinion. Every time I have the opportunity to talk to trial attorneys, district attorneys and judges, I try to comment on the problem that we experience as appellate judges when an adequate record is not made below.

¶ 2 This case exemplifies these difficulties as the record before us is lacking in three respects. First, the record is silent as to why the prosecutor offered the punishment of life without the possibility of parole before the second stage of a trial where the death penalty had been sought. Second, the record is silent as to why the trial judge-probably the most experienced capital case trial judge in Oklahoma-rejected the sentencing agreement. And third, given that this was a second stage case where the defense attorney was trying to save his client's life, it was

incumbent upon defense counsel to make a clear record of his client's knowing and intelligent waiver of his rights to jury sentencing and to appeal in exchange for the sentence of life without parole. I specially concur with the Court's modification of the sentence in this case from death to life without the possibility of parole.